UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

MICHAEL ELLISON, *et al.*,
*Plaintiffs*,

v.                                              No. 1:23-cv-00132 (MSN/LRV)

INOVA HEALTH CARE SERVICES, *et al.*,
*Defendants.*

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter comes before the Court on Defendants' Motion to Dismiss or, in the alternative, Motion to Strike Class Claims (Dkt. No. 37). For the reasons stated below, that motion will be granted in part and denied in part.

## I.   BACKGROUND

Stemming from the COVID-19 pandemic, this case involves a hospital's efforts to respond to the rapidly changing circumstances of this public health crisis and how those efforts allegedly impacted its employees' exercise of their religious beliefs.

### A.  Factual Background

In July 2021, Defendant Inova Health announced that it would require all hospital employees to receive the COVID-19 vaccine. Dkt. No. 23 ¶ 24 ("Am. Compl."). However, that mandate was not absolute: employees unable to be vaccinated for medical reasons or unwilling to be vaccinated for religious reasons could request either a permanent or temporary exemption from the otherwise mandatory policy. *Id.* ¶ 26. And, by and large, when an employee requested an exemption, it was granted within a few days. *Id.* ¶ 29.

1

But, in November 2021 (and in response to continuing pandemic-related concerns), the United States Centers for Medicare and Medicaid ("CMS") issued a mandate requiring all medical care providers and their employees to be vaccinated. Dkt. No. 38 at 3–4. The CMS mandate also outlined procedures for how covered healthcare providers were to evaluate exemption requests—procedures that were far more robust than the ones Inova implemented during the initial phases of its vaccination policy. *Id.* at 4. Inova was therefore required to update its policy, meaning that previously granted exemption requests needed to be re-evaluated. *Id.*

In February 2022, Inova announced that any employee who had previously been granted an exemption from the vaccine policy needed to reapply so that their request could be evaluated in light of the new policy. *Id.* at 4–5. Inova admitted that it was "going back on its word" but explained that it was obligated to do so under the CMS mandate, which required exemption requests to be scrutinized more closely. *Id.*; Am. Compl. ¶ 37.

After the implementation of the new policy, Plaintiffs Michael Ellison, Arin Jenkins, and Andrea Graham all reapplied for religious exemptions, asserting that various tenets of their Christian faith prevented them from receiving the vaccine. Am. Compl. at 13–14, 17–18, 22–23. Specifically, Ellison (a data-analyst) claimed that he could not receive the vaccine because he was required to treat his body as a temple of the Holy Spirit and was not to ingest anything that could potentially harm it. *Id.* ¶ 81. Ellison also holds a religious objection to abortion and, by extension, objected to the COVID-19 vaccines because they were developed using fetal cell lines. *Id.* ¶ 83. Next, Jenkins (a staff nurse) also stated that his faith required that he treat his body as a temple of God and that, as a result, he could take the vaccine only if, after prayer, he received approval from God. *Id.* ¶¶ 148, 152. Finally, after originally requesting a medical exemption based on her intention to become pregnant, Graham (an emergency room nurse) also asserted that her body was

a temple, that her healthcare decisions were guided by prayer, and that she had not received authorization from God to take the vaccine. *Id.* ¶¶ 116, 119, 121. Graham also claimed that she was unable to comply with the policy because she had a religious objection to the use of fetal cell lines in the development of the vaccine. *Id.* ¶ 117. Each of the Plaintiffs' requests were denied. *Id.* ¶¶ 95, 128, 165.

### B. Procedural History

Between March 2022 and December 2022, each of the Plaintiffs either resigned or were terminated for failure to comply with the hospital-wide vaccination policy. Am. Compl. ¶¶ 100, 134, 169. Each also filed their charges with the EEOC. *Id.* ¶¶ 101, 135, 171. And each received a right-to-sue letter. *Id.* ¶¶ 103, 137, 172.[1]

Then, in January 2023, Plaintiffs filed a class-action complaint (Dkt. No. 1), which was later amended on April 4, 2023. *See generally* Dkt. No. 23 (Amended Complaint). That operative Complaint divides the claims between two proposed classes, the "Religious Discrimination Class" and the "Permanent Exemption Class." Am. Compl. ¶ 179.

The Religious Discrimination Class—represented by all Plaintiffs—alleges that Inova violated both Title VII of the Civil Rights Act of 1964 and the Virginia Human Rights Act ("VHRA") by, among other things, firing employees or refusing to hire applicants based on their religious exercise. *See id.* ¶¶ 201–56.

The Permanent Exemption Class—represented by Ellison and Jenkins—alleges that Inova created a binding contract when it granted "permanent" exemptions to induce each class member to continue working at Inova. *See id.* ¶¶ 257–64. In the alternative, the Permanent Exemption Class

---

[1] There is a dispute about Graham's exhaustion of her claims concerning the termination of her employment. *See* Dkt. No. 38 at 11. However—because exhaustion is not a jurisdictional bar under Title VII, *see Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982), and because, for the reasons below, the Court will dismiss those claims on their merits—the Court need not address Defendants' exhaustion arguments.

argues that Inova's promise of permanent exemptions is nonetheless enforceable because the promise created a quasi-contract that blocks the hospital's attempt to change course. *Id.* ¶ 262.

On April 18, 2023, Inova filed a motion to dismiss Plaintiffs' claims or strike the class allegations. *See* Dkt. No. 37. Plaintiffs responded on May 2. Dkt. No. 40. Inova replied. Dkt. No. 41. The Court held oral argument on May 26. Dkt. No. 43. And today, the Court will grant Defendant's motion in part and deny it in part.

## II.   LEGAL STANDARDS

***Motion to Dismiss.*** The Federal Rules of Civil Procedure provide that a court may dismiss a complaint when the plaintiff has failed to state a claim for which the court may grant relief. Fed. R. Civ. P. 12(b)(6). Thus, to state a viable claim, a plaintiff's "factual allegations must be enough to raise a right to relief above the speculative level," and the pleading must contain "enough facts to state a claim to relief that is plausible on its face" and "nudge [the] claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545, 570 (2007). A plaintiff must allege "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). Instead, the complaint must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. A plaintiff's failure to allege an essential element of their claim warrants dismissal. *See Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020).

***Motion to Strike.*** As will be explained more fully below, a class action is "'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011). Thus, to qualify for relief under this

exception to the general rule, Plaintiffs must "affirmatively demonstrate [their] compliance with Rule 23 [of the Federal Rules of Civil Procedure]." *Id.* at 350.

## III.   DISCUSSION

### A.  Plaintiffs' Religious-Discrimination Claims

#### 1.   Title VII

Plaintiffs' principal argument is that Defendants, by rejecting requests for religious exemptions from the vaccine requirement, violated Title VII's requirement that an employee's religious beliefs be accommodated.   Am. Compl. ¶¶ 201–28. With one exception, the Court disagrees.

Title VII makes it unlawful for covered employers "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges [of] employment, because of such individual's . . . religion." 42 U. S. C. §2000e-2(a)(1) (1964 ed.). And although, as originally enacted, the statute did not spell out what it meant by discrimination "because of . . . religion," the EEOC has interpreted that provision to mean that employers were obligated "to make reasonable accommodations to the religious needs of employees" whenever that would not work an "undue hardship on the conduct of the employer's business." *See Groff v. DeJoy*, 600 U.S. ___ (2023) (slip. op., at 4–5) (citing 29 CFR § 1605.1).[2] Thus, to make out a plausible failure-to-accommodate claim under Title VII, a plaintiff must plead, and ultimately show, that: "(1) he or she has a bona

---

[2] On June 30, 2023, Plaintiffs submitted a Notice of Supplemental Authority, bringing *Groff* to the Court's attention. *See* Dkt. No. 46. While the Court  recognizes that the case represents the Supreme Court's most recent decision on the issue of Title VII religious discrimination, the Court concludes that *Groff* does not have any bearing on the resolution of the instant motion. That decision, however, may become relevant at the summary judgment stage, when the Court will evaluate whether accommodating Ellison's request would have placed an undue burden on Defendants. *See generally Groff*, 600 U.S. ___ (slip op.) (evaluating the "undue burden" standard that is triggered only after a plaintiff makes a *prima facie* showing of discrimination).

fide religious belief that conflicts with an employment requirement; (2) he or she informed the employer of this belief; [and] (3) he or she was disciplined for failure to comply with the conflicting employment requirement." *Chalmers v. Tulon Co. of Richmond*, 101 F.3d 1012, 1019 (4th Cir. 1996) (citations omitted); *see also EEOC v. Firestone Fibers & Textiles Co.*, 515 F.3d 307, 312 (4th Cir. 2008) (same) ("*Firestone Fibers*").[3]

The issue before the Court is whether Plaintiffs have adequately pleaded their *prima facie* case. Defendants move to dismiss Plaintiffs' claims on the ground that Plaintiffs have not alleged the first element—that they hold a religious belief that conflicts with the vaccination requirement. Specifically, Defendants contend that Plaintiffs have failed to show that their objections to the vaccine requirement are based on a "sincerely held" religious belief or practice. *EEOC v. Consol Energy, Inc.*, 860 F.3d 131, 142–43 (4th Cir. 2017).

As Defendants point out, Title VII does not protect just any belief. To be protected, an employee's belief must be religious in nature. *McManus v. Bass*, No. 2:05-cv-117, 2006 WL 753017, at *4 (E.D. Va. Mar. 21, 2006) (citing *Wisconsin v. Yoder*, 406 U.S. 205, 215–16 (1972) ("*Yoder*"); *see also Holt v. Hobbs*, 574 U.S. 352, 360–61 (2015) (noting, in the First Amendment context, that a "request for an accommodation must be sincerely based on a religious belief and not some other motivation"). Of course, courts are in no position to "question the centrality of particular beliefs or practices of faith, or the validity of particular litigants' interpretations of those creeds." *Hernandez v. Comm'r*, 490 U.S. 680, 699 (1989). Indeed, the determination of whether a plaintiff's beliefs are religious must not turn upon a judicial perception of the belief or practice in

---

[3] The second and third prongs of this test are not at issue in this case. There is no dispute that Plaintiffs brought their objections to the vaccination requirement to the hospital's attention by submitting exemption requests. It is undisputed that Plaintiffs faced adverse employment action because of their decisions to remain out-of-compliance with the policy after their exemption requests were denied. The Court's analysis will focus only on the first question: whether Plaintiffs had a bona fide religious belief that conflicted with Inova's vaccination requirement.

question. *See Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 714 (1981); *see also United States v. Seeger*, 380 U.S. 163, 185 (noting that courts are not free to reject beliefs because they consider them "incomprehensible"). The Court must therefore determine whether the Plaintiffs' purported beliefs are both (1) "sincerely held" and (2) "religious" in nature. *Welsch v. United States*, 398 U.S. 333, 339 (1970).

### i.    Sincerity

To start, the Court finds that each Plaintiffs' beliefs are sincerely held as there is no evidence introduced at this stage of the proceedings that suggests that the beliefs have been concocted for litigation or are otherwise disingenuous.[4] For that reason, the Court will direct its focus to the question of religiosity.

### ii.    Religiosity

However, the Court will nonetheless reject all but one of Plaintiffs' claims as it finds that they are not rooted in concerns that are religious in nature.

Whether one's beliefs and practices are religiously motivated is of course a difficult question for courts of law to decide. *Doswell v. Smith*, 139 F.3d 888 (4th Cir. 1998). For that reason, courts must be sure to avoid any "predisposition toward conventional religions" as to ensure that unfamiliar or unconventional beliefs are not incorrectly labeled as "secular." *Id.* (citing *Africa v. Pennsylvania*, 662 F.2d 1025, 1031 (3d Cir. 1981)). Still, "the very concept of ordered liberty precludes allowing every person to make his [or her] own standards on matters of conduct in which society as a whole has important interests." *Yoder*, 406 U.S. at 215–16. Indeed, "[a]

---

[4] In their papers, Defendants point out that, when the vaccine requirement was first implemented, Graham requested a temporary *medical* exemption based on her intention to get pregnant in the immediate future. *See* Am Compl. ¶ 119. In their view, that alone is reason to doubt the sincerity of her present assertion that she objects to the hospital's policy on religious grounds. *See* Dkt. No. 38 at 16–17. However—considering both the procedural posture of this case and its rejection of Graham's claims under the "religiosity" prong—the Court will take Graham at her word.

system of religious beliefs, however, is distinct from a way of life, even if that way of life is inspired by philosophical beliefs or other secular concerns." *Versatile v. Johnson*, No. 3:09-cv-120, 2011 WL 5119259, at *4 (E.D. Va. Oct. 27, 2011) (internal quotation omitted). Thus, in determining whether an employee's beliefs are religious in nature, courts have analyzed whether the beliefs in question (1) "address fundamental and ultimate questions having to do with deep and imponderable matters," (2) are "comprehensive in nature," and (3) "are accompanied by certain formal and external signs." *Africa*, 662 F.2d at 1032.[5] It is also worth noting that the religiosity inquiry is a necessarily individualized one. *Cf.* EEOC Compliance Manual at § (a)(1) (explaining that deciding whether a belief or practice is religious requires a "case-by-case inquiry"); *see also Dachman v. Shalala*, 9 F. App'x 186, 191-93 (4th Cir. 2003) (holding that an employee was required to accommodate a plaintiff who requested time off to observe the sabbath but noting that the same would not be true if the plaintiff's request was spurred by secular obligations like household chores). Therefore, the Court will separately evaluate the claims raised by each of the three Plaintiffs.

### a.  Body-as-a-Temple Claims

*Ellison.* In Ellison's request for exception, he claims that, as a Christian, he has a right to refuse the vaccine. Specifically, he claims that the Bible requires Christians to treat their bodies as "temple[s] of the Holy Spirit," meaning that he is "compel[led]" to care for his mind and body.

---

[5] *Africa* is a non-binding decision from the Third Circuit. However, although the Fourth Circuit has not formally adopted the standard, both this Court and the appellate court have cited *Africa* with approval when describing the "useful indicia" for evaluating whether beliefs are religious rather than secular. *See, e.g.*, *Dettmer v. Landon*, 799 F.2d 929, 931 (4th Cir. 1986); *Versatile v. Johnson*, No. 3:09-cv-120, 2011 WL 5119259, at *5 (E.D. Va. Oct. 27, 2011), *aff'd*, 474 F. App'x 385 (4th Cir. 2012). The Court also notes that neither party objects to the use of the standard laid out in *Africa*. *See* Dkt. No. 44 at 18:11–15 (Defendants agreeing that *Africa* sets out the appropriate test at oral argument); *id.* at 53:13–15 (Plaintiffs acquiescing).

Dkt. No. 40-3 at 3.[6] And because, in his view, taking the COVID-19 vaccine would "introduce to [his] body a medication that could induce harm," he claims that complying with the hospital's policy would be "antithetical to [his] desire to honor God." *Id.* Notably, Ellison supports his claim through references to his "personal analyses" of CDC and FDA databases that he believes prove that "there is a 28 times more likely chance of adverse reactions from the COVID-19 vaccines in the last 15 months, than from any of the other 50+ vaccinations." *Id.* Ellison also provided "supplemental information" four months after submitting his initial request to be exempted from the new policy. Dkt. No. 40-4 at 2.[7] In his renewed request Ellison first re-asserted the argument about his body being a temple and the need to keep it "protected and undefiled." *Id.* at 3. He also stated (for the first time) that he prayed about the vaccine and that "the answer that [God] revealed was that [he] must protect [his] temple from the vaccine and refuse it." *Id.*

Based on Ellison's own stated reason, the Court finds that, though couched in religious terms, Ellison refused the vaccines based on concerns of vaccine safety. District courts have routinely rejected similar claims. *See, e.g.*, *Passarella v. Aspirus, Inc.*, Nos. 22-cv-287, 22-cv-342, 22-cv-392, 2023 WL 2455681, at *2-7 (W.D. Wis. Mar. 10, 2023) (finding that exemption requests "predicated fundamentally on [] concerns with the safety of the vaccine and [plaintiffs'] right to bodily integrity"—even if based on the "belief that [plaintiff's] body is a temple" and "ratified by prayer"—are fundamentally "medical judgments . . . , not matters of religious belief").

Accordingly, Ellison's body-as-a-temple claims will therefore be dismissed.

---

[6] Generally, at the motion to dismiss stage, court are limited to considering only the allegations contained in the plaintiff's complaint. However, because the Amended Complaint expressly refers (and thus incorporates) to Plaintiffs' exemption requests, the Court is free to consider them at this stage. *See A.C. v. Henrico Cnty. Sch. Bd.*, 610 F. Supp. 3d 857, 860 (E.D. Va. 2022) (noting that courts may consider documents that are either explicitly incorporated into the complaint by reference or those attached to the complaint as exhibits).

[7] Ellison claims that felt compelled to submit a new letter after concluding that the medical and scientific concerns in his earlier request "may have overshadowed [his] primary religious convictions." Dkt. No. 40-4 at 2.

*Jenkins.* Jenkins also claims that the Christian Bible requires him to treat his body as a "temple of the Holy Spirit." Dkt. No. 40-2 at 2. In his words, Jenkins believes that "it is a God-given responsibility and requirement for [him] to protect the physical integrity of his Body." *Id.* And he further explained that he does so by "pray[ing] over every decision [he] make[s] concerning his body or [his] health" Dkt. No. 40-2 at 2.

That statement fails to establish a sincere religious objection under the *Africa* standard laid out above. Jenkins's belief that if, after his prayer, "God answers and interdicts [his] participation," *id.*—which is, by its nature, unverifiable—amounts to the type of "blanket privilege" that undermines our system of ordered liberty. *Africa*, 663 F.2d at 1031. Certainly, if taken to its logical extreme, Jenkins's claim would serve as a "limitless excuse for avoiding all . . . obligations." *See Finkbeiner v. Geisinger Clinic*, 623 F. Supp. 3d 458, 465 (M.D. Penn. 2022) (applying *Africa* and rejecting religious-discrimination claims concerning COVID-19 requirements because holding otherwise would "count everything [the plaintiff] believes about healthy living as religious practice").

Accordingly, Jenkins's body-as-a-temple claims will therefore be dismissed.

*Graham.* Like Jenkins, Graham claims that "her faith requires her to refuse any particular form of medical treatment . . . unless and until she has sought and received God's permission to accept it, through prayer." Am. Compl. ¶ 110.[8] However, like Jenkins's, that would confer the same sort of blanket privilege that courts must reject. *See Finkbeiner*, 623 F. Supp. 3d at 465.

Accordingly, for the reasons discussed above, Graham's claims will also be dismissed.

---

[8] Graham's exemption request is not a part of the record. For that reason, the Court will evaluate the reasons given solely in the Amended Complaint.

### b.  Abortion-Based Claims

***Ellison.*** Ellison's supplemental letter also included a paragraph concerning the use of "aborted fetal cell lines" in the development and testing of some of the vaccines. Dkt. 40-4 at 2. In that letter, he stated that he had a "sincerely held religious belief in the sanctity of human life" and that—because he "sincerely believe[d] that the use of these bodily remains renders these vaccines unclean,"—he could not comply with the policy for that reason. *Id.*[9]

With respect to this claim, the Court finds that Ellison has adequately linked his objection to a sincerely held religious belief. In his request, he refers to verses in the Christian Bible that, in his view, support the notion that "life begins at conception," and he goes on to explain that, because "every life is sacred," "[a]ny action that would . . . generate a future demand for fetal cell tissue, violates the core religious beliefs that [he] hold[s] dear." *Id.* Ellison continues that he believes his faith did not allow him to "benefit from a human being whose life was taken by the hands of another," and thus, in his view, receiving the vaccine would amount to sin. *Id.* Based on these statements, Ellison's exemption request provides sufficient allegations regarding his subjective personal beliefs, how those beliefs are related to his faith, and how those beliefs form the basis of his objection to the COVID-19 vaccination.

For that reason, that claim is adequate to survive a motion to dismiss. *See Aliano v. Twp. of Maplewood*, No. 22-cv-5598, 2023 WL 4398493, at *7 (D.N.J. July 7, 2023) (denying a motion to dismiss when the plaintiff identified the textual source of the anti-abortion belief and explained

---

[9] In support of this contention, Ellison cites Romans 14:14 of the Christian Bible which states that: "I know, and am persuaded by the Lord Jesus, that there is nothing unclean of itself: but to him that esteemeth anything to be unclean, to him is unclean."

how their understanding of the verse led them to conclude that receiving the COVID-19 vaccine conflicted with their faith).[10]

*Graham.* Graham also claims that her religious aversion to abortion prevents her from getting the COVID-19 vaccine. Am. Compl. ¶ 117. However, except for a single conclusory statement, Plaintiff has not shown how that aversion is based on Graham's religious beliefs. As explained above, plaintiffs must provide more than conclusory allegations that a belief is religious; they must allege facts explaining how a subjective belief is religious in nature and connect their objection to that belief.

Graham has not done so. The only information before the Court concerning her abortion-based objection to the vaccine is found in a single numbered paragraph of the Plaintiffs' Amended Complaint. *See* Am. Compl. ¶ 117 ("Ms. Graham also has religious objections to abortion, and to receiving vaccines that were testing [sic] or produced using materials derived from abortion."). That conclusory statement fails to provide a sufficient connection between Graham's objection to the COVID-19 vaccines—that they were "tested or developed using cell lines derived from aborted

---

[10] The Court notes the similarity between abortion-based objections to the contents of the most accessible COVID-19 vaccines and other faith-based objections to other vaccines or other medicines that contain ingredients derived from pork, beef, or other animal products. *See* Tara M. Hoesli, et al., *Effects of Religious and Personal Beliefs on Medication Regimen Design*, 34 Orthopedics 292, 292 (2011) (noting that "[m]ore than 1000 medications contain inactive ingredients derived from pork or beef, the consumption of which is prohibited by several religions"). For that reason, courts faced with those questions have held that faith-based objections to medications based on their ingredients are a proper basis for Title VII relief. *See, e.g.*, *Haley v. Cmty. Hosp.*, No. 2:21-cv-141, 2023 WL 403722, at *6 (N.D. Ind. Jan. 25, 2023) (finding that a plaintiff stated a *prima facie* case for religious discrimination when he refused to take the influenza vaccine due to concerns that it contained pork products or other unclean ingredients that conflicted with his religious beliefs).

That said, the Court also notes that—just as non-porcine and non-bovine alternatives are being made available to avoid the problems with religious-based objections to pork and beef—COVID-19 vaccines that were not developed using fetal cell lines have been available for more than a year. *See* U.S. Food and Drug Administration, FDA Authorizes Emergency Use of Novavax COVID-19 Vaccine, located at: *https://tinyurl.com/yu85kdmk* (July 13, 2022). However—although an employer would need only widen its list of accepted vaccinations to include the non-objectionable vaccines in order to accommodate an employee's abortion-based aversion to the COVID-19 vaccine today—Defendants' policy in this case required that hospital employees receive a vaccine manufactured by Pfizer, Moderna, or Johnson & Johnson. Am. Compl. ¶ 25. For that reason, the Court concludes, at this stage in the proceedings, that Ellison has adequately alleged the policy at issue conflicted with his sincerely held religious beliefs.

fetuses," *id.* ¶ 118—and her subjective religious beliefs. Graham did not provide any additional information regarding the nature of *her* Christian beliefs, including how receiving the COVID-19 vaccine would violate those beliefs. Again, before treating a belief as "religious," the Court must assess whether Graham's belief is based on her "own scheme of things"—regardless of what is widely accepted in her stated religion. *See Ambrose v. Gabay Ent & Assocs., P.C.*, No. 12-cv-5453, 2013 WL 4195387, at *3–5 (E.D. Pa. Aug. 15, 2013). It is Graham's *subjective* religious belief that is protected; and, for that reason, she must provide information concerning the religious nature of that belief and how it is connected to her objection to the COVID-19 vaccine. *See Blackwell v. Lehigh Valley Health Network*, No. 22-cv-03360, 2023 WL 362392, at *8 (E.D. Pa. Jan. 23, 2023) (dismissing a plaintiff's claims because the plaintiff "fail[ed] to plead any additional information about the religious nature of her beliefs" beyond identifying an organized religion she belonged to and claiming her objection arose from that organized religion).

Because Graham has failed to do so, her abortion-based claim will be dismissed. *See Aliano*, 2023 WL 4398493, at *10 (granting a motion to dismiss when a plaintiff alleged only that the vaccine contained fetal cell lines, that the plaintiff was a Roman Catholic, that abortion conflicted with Roman Catholic teachings, and that the COVID-19 vaccine therefore conflicted with their religious beliefs).

### 2.  Virginia Human Rights Act

Plaintiffs also bring claims under the VHRA, claiming that Defendants violated the statute by not accommodating Plaintiffs' religious beliefs. Am. Compl. ¶¶ 229–56. However, as explained below, that statute does not require employers to provide such accommodations.

Unlike Title VII—which expressly allows plaintiffs to bring failure-to-accommodate claims against their employer—the VHRA does not contain any such language. *Compare* Va. Code

§ 2.2-3901(E) (VHRA's definition of religious discrimination); *with* 42 U.S.C. § 2000e(j) (Title VII's definition of religious discrimination); *see also* Dkt. No. 40 at 13 (Plaintiffs conceding that "the VHRA's definition of religion does not include the words 'reasonable accommodation'"). Instead, the statute prohibits employers only from taking adverse action against an employee based on their "outward expression of their religious faith." *See* Va. Code § 2.2-3901(E).

Despite the law's silence on the issue, Plaintiffs contend that this prohibition necessarily requires employers to accommodate religious exercise. Dkt. No. 40 at 12. However, reading such a requirement into the statute would run counter to the traditional methods of statutory construction. *Cf. Bates v. United States*, 522 U.S. 23, 29 (1997) (noting that courts should "resist reading words or elements into a statute that do not appear on its face"). Moreover, in addition to noting what the Virginia General Assembly did not say, the Court acknowledges what it did. Before amending the section pertaining to religious discrimination (in 2022), the state legislature added language that unambiguously gave pregnant employees (in 2020) and disabled employees (in 2021) the right to bring failure-to-accommodate claims against their employers. *See* Va. Code § 2.2-3909 (pregnancy); Va. Code § 2.2-3905.1 (disability).  And—as the Fourth Circuit has explained—"where [the legislature] includes particular language in one section of a statute but omits it in another provision of the same Act, it is generally presumed that [the legislature] acts intentionally and purposefully in the disparate inclusion or exclusion." *Soliman v. Gonzales*, 419 F.3d 276, 283 (4th Cir. 2005) (citing *INS v. Cardoza-Fonseca*, 480 U.S. 421, 432 (1987)). With that guidance, the Court is not free to adopt Plaintiffs' construction of the law at issue. Not only is the burden to accommodate Plaintiffs' religious beliefs not apparent on the face of the statute, but Virginia's legislature has made the deliberate decision not to create such a requirement—despite having done so in other sections of the same statute.

14

Therefore, Plaintiffs' VHRA claims will be dismissed.[11]

## B.  Plaintiffs' Contract Claims

The Permanent Exemption Class's claims fail as well. Ellison, Jenkins, and the putative members of their class allege that Defendants were contractually obligated to honor the "permanent" exemptions that the employees were given under the original vaccination policy and that Defendants breached that contract when they revoked those exemptions. Am. Compl. ¶¶ 257–64. Alternatively, Plaintiffs contend that, even if granting the exemptions did not create an enforceable contract, Defendants are nonetheless liable under equitable promissory estoppel principles. Am. Compl. ¶ 262. Neither theory holds up under scrutiny.

### 1.  Breach-of-Contract

To support a breach-of-contract claim under Virginia law, a plaintiff must sufficiently plead that (1) the defendant had a legally enforceable obligation, (2) the defendant failed to perform that obligation, and (3) the plaintiff was harmed as a result. *See Navar, Inc. v. Fed. Bus. Council*, 784 S.E.2d 296, 299 (Va. 2016). However, because the Court finds that Plaintiffs fail to satisfy the first element, it will not reach the second or third.

---

[11] This decision is also consistent with those of other federal district courts that have faced similar claims brought under similar anti-discrimination laws:

As discussed in the parties' briefing and at the May 26 hearing, the District of Minnesota has held that—because "[i]n contrast [to Title VII], the [Minnesota statute] . . . does not include any language requiring an employer to provide any religious accommodation" and because of "the [Minnesota statute]'s explicit requirement to provide one type of accommodation (disability) but not the other (religion)"—the plaintiff's failure-to-accommodate claims were not cognizable. *See Aronson v. Olmsted Med. Ctr.*, No. 22-cv-1594, 2023 WL 2776095, at *3–5 (D. Minn. Apr. 4, 2023) (COVID-19 vaccination case).

And as pointed out in Defendants' Notice of Supplemental Authority (Dkt. No 47), the Western District of Tennessee has also held that—because the "language of the [Tennessee law] differed from that found in Title VII" and "there is no explicit language in the [Tennessee law] imposing a duty to accommodate religious beliefs"—the court would not read such a requirement into the statute. *Johnson v. Tyson Foods, Inc.*, No. 21-cv-1161, 2023 WL 3901485, at *3–4 (W.D. Tenn. June 8, 2023) (COVID-19 vaccination case).

Forming a contract (*i.e.*, the "legally enforceable obligation") requires three basic ingredients: offer, acceptance, and consideration. *See Jones v. Peacock*, 591 S.E.2d 83, 87 (Va. 2004). And although the Court notes that Plaintiffs have not adequately alleged any of the three requirements, today's opinion will address only Plaintiffs' failure to show that they provided valuable consideration.

Plaintiffs assert that a contract was formed when Defendants offered "permanent" exemptions from the vaccine requirement and employees accepted that offer by continuing to work for the hospital. Am. Compl. ¶ 32. However, even accepting those allegations as true, the very essence of a contract is that it places bilateral obligations on the parties to that agreement. *C.G. Blake Co. v. W.R. Smith & Son*, 133 S.E. 685, 688 (Va. 1926) ("[A] contract implies mutual obligations."). In other words, the consideration element generally requires a finding that each party agreed to take on a legal obligation (*i.e.*, do something that they were not already required to do). *See* Restatement (Second) of Contracts § 71 ("To constitute consideration, a performance or a return promise must be bargained for. A performance or return promise is bargained for if it is sought by the promisor in exchange for his promise and is given by the promisee in exchange for that promise."); *see also Hamer v. Sidway*, 27 N.E. 256 (N.Y. 1891) (foundational case on the consideration requirement). As such, the Court must determine what obligations (if any) Plaintiffs took on in exchange for Defendants' alleged promise to permanently exempt the employees from the hospital's vaccination requirement. Having carefully reviewed the allegations in the Amended Complaint, the Court finds that there were none.

Plaintiffs suggest that there was consideration because they implicitly agreed to continue working for Inova and not to pursue employment elsewhere. Dkt. No. 40 at 17–19. However, even

16

if that was enough to establish consideration, it is difficult to reconcile that legal theory with the facts of this case. Again, parties must take on *new* obligations. Plaintiffs here have not.

Under Plaintiffs' theory of consideration, they provided consideration by continuing to work for the hospital. *Id.* However, before the exemptions were provided, Plaintiffs were under no obligation to continue reporting to work and Inova could likewise terminate their employment at any point and for any reason. *See Giles v. Wines*, 546 S.E.2d 721, 723 (Va. 2001) ("In Virginia, an employment relationship is presumed to be at-will . . . and may be terminated by the employer or employee for any reason upon reasonable notice."). And, Plaintiffs concede that, after the exemptions were provided, "[t]here would be no remedy [if employees stopped reporting to work after receiving an exemption] because [exempted employees] were not obligated to do that." Dkt. No. 44 at 46:19–20.[12] Thus, because Plaintiffs remained free to unilaterally sever the employment relationship both before and after the alleged agreement, the Court finds that they did not provide the consideration necessary to create a binding agreement.[13] And because the Court finds that any agreement between the parties was not supported by valuable consideration, it must also conclude that Plaintiffs' breach-of-contract claims fail to provide a basis for relief.

---

[12] This fatal concession came when Plaintiffs' counsel was pressed on the issue at the Court's May 26 hearing.

[13] Fighting this conclusion, Plaintiffs cite a string of cases that purportedly support a finding that Plaintiffs' decision to continue working at Inova was enough consideration to support the contract. However, contrary to Plaintiffs' strained readings of those cases, they are distinguishable or otherwise unpersuasive.

For example, Plaintiffs erroneously rely upon *Larkman v. Dynalectron Corp.* for the assertion that "[a]n employee's continued employment" is sufficient consideration to rebut a presumption of at-will employment. 831 F.2d 291, 291 (4th Cir. 1987). However, *Larkman* stands for the proposition that, when the promise of a *certain, fixed period* of employment is in dispute, the employee may present evidence of an implied contract where their continued employment serves as consideration. *See id.* That makes *Larkman* different than this case, where it would be irrational to presume that both parties understood use of the word "permanent" as transforming the nature of employment by creating a promise to employ Plaintiffs "permanently."

Plaintiffs similarly mischaracterize *Barger v. Gen. Elec. Co.*, 599 F. Supp. 1154 (W.D. Va. 1984). *Barger* and the cases it cites focus on *explicit* promises where an employee *expressly* agreed that they would continue working in exchange for the benefit. *Id.* at 1160 (citing *Kiser v. Amalgamated Clothing Workers*, 169 Va. 574, 585 (1938) *and Sea-Land Serv., Inc. v. O'Neal*, 224 Va. 343 (1982)). Here, Plaintiffs made no such promise.

Plaintiffs' breach-of-contract claims will therefore be dismissed.

### 2. Promissory Estoppel

Pleading in the alterative, Plaintiffs also argue that Defendants were nonetheless obligated to honor the "permanent" exemptions under the doctrine of promissory estoppel. Generally, that common law doctrine is rooted in equitable principles and prevents a defendant from backing out of promises—even though that promise did not create a binding contract. And in Virginia, "[t]he cause of action based on promissory estoppel consists of four elements, recently defined as: (1) a promise, (2) which the promisor should reasonably expect to cause action by the promisee, (3) which does cause such action, and (4) which should be enforced to prevent injustice to the promisee." *Mongold v. Woods*, 677 S.E.2d 288, 292 (Va. 2009).

On this front, Plaintiffs argue that, by issuing "permanent" exemptions, Defendants created the expectation that Plaintiffs' employment relationship with the hospital would be terminated only for cause in exchange for the employees not seeking jobs elsewhere. Am. Compl. ¶ 262. However, under Virginia law, there is a strong presumption against such for-cause relationships and in favor of at-will employment. *See Norfolk S.R. Co. v. Harris*, 59 S.E.2d 110, 114 (Va. 1950) ("It is settled doctrine in [Virginia] that where no specific time is fixed for the duration of an employment, there is a rebuttable presumption that it is an employment at will, terminable at any time by either party."). Thus, in the absence of a clear agreement to the contrary, courts are to presume that all employment is terminable at the will of either party. *See Norfolk*, 59 S.E.2d at 114; *see also Miller v. SEVAMP, Inc.*, 362 S.E. 2d 915, 917–18 (Va. 1987) ("[A] pleading seeking to recover damages for the termination of a contract of employment, the terms of which give rise to no fair inference of a specific period for its intended duration, and which is not supported by any substantial additional consideration . . . is demurrable.").

Plaintiffs do not provide any evidence of such an agreement in this case. Instead, they suggest that the agreement was "understood" as Defendants' attempt to induce the employees to keep working for the hospital. *See* Am. Compl. ¶ 261; Dkt. No. 40 at 17. However, that is not enough. Considering the presumption that must be applied, Plaintiffs fail to establish that Defendants could *reasonably* expect the employees to believe not only that their employment conditions were substantially altered, but that the hospital would do so implicitly.

Because the doctrine of promissory estoppel requires such a showing, Plaintiffs' promissory estoppel claims must therefore be dismissed.

### C.  Class Claims

Finally, Plaintiffs' class allegations will be stricken. Under Rule 23, one or more members of a putative class may sue as representative parties on behalf of all if they satisfy the following threshold requirements: (1) numerosity; (2) commonality; (3) typicality; (4) adequacy of representation, and (5) ascertainability. *See Peters v. Aetna Inc*., 2 F.4th 199, 241–42 (4th Cir. 2021) (citing Fed. R. Civ. P 23(a)).  Once those threshold requirements are met, putative class members must also satisfy Rule 23(b) by showing that either: (a) individual actions would risk inconsistent or non-dispositive judgments, (b) that they are seeking class-wide injunctive or declaratory relief, or (c) that there are common legal or factual questions that predominate over any other concerns affecting individual members. *Gunnells v. Healthplan Servs., Inc*., 348 F.3d 417, 423 (4th Cir. 2003) (citing Fed. R. Civ. P. 23(b)).

Moreover, the Supreme Court has made clear that it is "quite obvious[]" that "the mere claim by employees of the same company that they have suffered a Title VII injury . . . gives no cause to believe that all their claims can productively be litigated at once." *Wal-Mart*, 564 U.S. at 350; *see also Adams v. Bethlehem Steel Corp*., 736 F.2d 992, 995 (4th Cir. 1984) ("In a very broad

and loose sense, any member of any [protected] class who [allegedly] suffers discrimination has the same interest as other members of the class who suffered discrimination in very different circumstances and by very different means, but clearly that is not [grounds to permit a matter to proceed as a class action].").[14] And most relevant to this case, The Fourth Circuit has explained that:

> As the statutory language of [Title VII] makes clear, this is not an area for absolutes. Religion does not exist in a vacuum in the workplace. Rather, it coexists, both with intensely secular arrangements such as collective bargaining agreements and with the intensely secular pressures of the marketplace. Hence the import of the statutory term "accommodate." The provision's use of the terms "reasonably" and "undue hardship" likewise indicates that this is a field of degrees, not a matter for extremes. Both terms are "variable ones," dependent on the extent of the employee's religious obligations and the nature of the employer's work requirements.

*Firestone Fibers*, 515 F.3d at 312.

With that in mind, the Court finds that—because they have not satisfied Rule 23's "commonality" element—Plaintiffs cannot pursue their lone remaining claim (failure to accommodate abortion-based objections to the vaccine policy, *see supra* pp. 10–11) on a class basis.

To establish commonality, a plaintiff must show their claims depend upon a common contention that makes class-wide resolution possible—*i.e.*, the putative class must share a question whose answer will resolve an issue that is central to the validity of each employees' claims in one stroke. *See Peters v. Aetna Inc*., 2 F.4th 199, 242 (4th Cir. 2021) (citing *Wal-Mart*, 564 U.S. at

---

[14] The current stage of the proceedings is not lost on the Court. Although the Court does not have the benefit of the discovery, there are times that the issues are clear enough at the pleading-stage to determine that a case is not appropriate for class relief. *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 160 (1982) (noting that "[s]ometimes the issues are plain enough from the pleadings" to make class determinations); *Scott v. Family Dollar Stores, Inc*., 733 F.3d 105, 109–10, 116 (4th Cir. 2013) (affirming dismissal of class allegations in complaint that were "insufficient to satisfy the commonality standard set forth in *Wal-Mart*"); *Knapp v. Zoetis, Inc*., No. 3:20-cv-191, 2021 WL 1225970, at *10 (E.D. Va. Mar. 31, 2021) (noting that a court may grant a motion to strike class certification before discovery if the "allegations are facially and inherently deficient")

350). However, the Court notes that, given the personal nature of religious beliefs, Plaintiffs' claims do not lend themselves to common resolution. *See* EEOC Compliance Manual § 12(A)(1) (explaining that determining whether a belief or practice is religious "is [] a situational, case-by-case inquiry"); *id.* ("The same [belief or practice] in one case might be subject to reasonable accommodation under Title VII because an employee engages in the [belief or] practice for religious reasons, and in another case might not be subject to reasonable accommodation because the practice is engaged in for secular reasons."); *see also* EEOC Compliance Manual § 12(A)(3) (explaining that "where an alleged religious observance, practice, or belief is at issue, a case-by-case analysis is required"). Specifically, Plaintiffs' failure-to-accommodate theory would require the Court to ask whether each putative class member's abortion-based objection to the COVID-19 vaccine was based on *their own* religious beliefs. *See Yoder*, 406 U.S. 205, 215–16. As exemplified both above and in the caselaw, the answer to that question may vary from person to person. *See supra* Part III(A)(1)(ii)(b) (finding that, while Ellison's abortion-based objections to the COVID-19 vaccine were religiously based, Graham's facially identical objections were not); *see also Aliano*, 2023 WL 4398493, at *7–10 (finding that one plaintiff's abortion-based objections to the COVID-19 vaccine were based on their religion but another plaintiff's abortion-based objections to the COVID-19 vaccine were not).

Given the risk of divergent answers to the critical questions to be answered through this litigation, the Court cannot conclude that this case would be efficiently resolved on a class basis. Plaintiffs' class allegation will therefore be stricken from the Amended Complaint. *See Wal-Mart*, 564 U.S. at 350 ("Dissimilarities within the proposed class" often "impede the generation of common answers.").

IV.      CONCLUSION

      For the foregoing reasons, it is hereby

      **ORDERED** that Defendants' Motion to Dismiss or, in the alternative, Motion to Strike

Class Claims (Dkt. No. 37) is **GRANTED IN PART** and **DENIED IN PART**; it is further

      **ORDERED** that Count I is **DISMISSED** only as to Plaintiffs Jenkins and Graham; it is

further

      **ORDERED** that Count II is **DISMISSED** as to all Plaintiffs; it is further

      **ORDERED** that Count III is **DISMISSED** as to all Plaintiffs; and it is further

      **ORDERED** that Plaintiffs' class allegations (¶¶ 179–200) are **STRICKEN** from

Plaintiffs' Amended Complaint.

      The Clerk is directed to send a copy of this Order to all counsel of record.

                                                         **SO ORDERED.**

                                            /s/
                                     Hon. Michael S. Nachmanoff
                                     United States District Judge

July 19, 2023
Alexandria, Virginia