## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

Michael ELLISON, Andrea GRAHAM, and
Arin JENKINS, on behalf of themselves and
all others similarly situated,

        Plaintiffs,

    v.

INOVA HEALTH SYSTEM FOUNDATION,
and INOVA HEALTH CARE SERVICES,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)

Case No. 1:23-cv-00132-MSN-LRV

---

### SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiffs Michael Ellison, Andrea Graham, and Arin Jenkins, on behalf of themselves and all others similarly situated, for their Amended Complaint against Defendants Inova Health System Foundation, and Inova Health Care Services (collectively "Inova"), hereby state as follows:

### INTRODUCTION

1.  Prominent among the heroes of the COVID-19 pandemic were health-care workers. In Virginia, that included "team members" at Inova's hospitals and clinics.

2.  Unfortunately, as the pandemic progressed, Inova began a systematic and unlawful effort to fire these heroes if they had religious objections to COVID-19 vaccines. This campaign demonstrated a truly shocking and shameful disregard for Inova's own promises and for its team members' legal right to religious accommodations. This case is the result.

3.  At first, Inova exempted many religious team members from its vaccine requirement—telling them in writing that "You have been approved for a **permanent** exemption

from the COVID vaccine(s), and You **will not** need to reapply for an exemption or supply additional paperwork in the future." (emphases in original).

4.      Unfortunately, just a few months after granting such "**permanent**" exemptions, Inova brazenly ripped up its promise, revoked the exemptions it had granted, and told employees they would have to apply all over again. Although Inova expressly acknowledged that it was "going back on its word," its only explanation was boilerplate, meaningless language about "continually reviewing and updating our approach."

5.      Things got even worse from there. Although Inova revoked religious exemptions and required re-application, it did not treat the matter as urgent. Instead, Inova allowed previously exempted employees to continue working, unvaccinated, for months while it sat on their new applications for religious accommodations.

6.      After months went by, Inova denied accommodations—and fired religious employees—*en masse*. Although hundreds of employees had applied for accommodations, Inova gave no sign that it had individually considered their requests, or even that it had read them. Instead, Inova issued a mass denial using a one-size-fits-all form letter. When individual Inova employees asked why their particular applications had been denied, Inova expressly refused to tell them. Inova then fired employees who refused to compromise their religious beliefs.

7.      All of this conduct by Inova was in flagrant violation of its legal obligations. Inova knew that, when its workplace requirements conflict with an employee's sincere religious observances, Title VII requires it to interact in good faith to identify and offer reasonable accommodations. Inova grossly and intentionally failed to do that. Its months of silence, followed by a boilerplate denial letter, is the very opposite of the legally required interactive process and reasonable accommodation. Moreover, Inova's willingness to let employees continue working,

unvaccinated, for months even *after* revoking their exemptions demonstrates that Inova certainly knew that some accommodation was possible.

8.      On top of that, Inova blatantly breached its written contracts with team members in which it had expressly promised that their exemptions were permanent and they would not need to re-apply.

9.      Inova's illegal firings have left its former employees with reduced incomes, and in some instances without any jobs at all. This class action is the necessary consequence of Inova's misconduct, and is the team members' final avenue for redress.

## JURISDICTION AND VENUE

10.     This Court has original subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331, as this action arises under the laws of the United States, 28 U.S.C. § 1341(a)(4), since it seeks to recover damages, attorneys' fees, and secure equitable relief under Acts of Congress, specifically Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000(e), *et seq*.

11.     The Court has supplemental jurisdiction over Plaintiffs' state-law contract and Virginia Human Rights Act ("VHRA") claims pursuant to 28 U.S.C. § 1367(), as they arise from the same transactions or occurrences as the claims over which this Court has original jurisdiction.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), as all or a substantial part of the events giving rise to the claims occurred within the District.

13.     This Court has personal jurisdiction over Inova as it is incorporated in, and has its principal place of business in, Falls Church, Virginia.

## **THE PARTIES**

14.    Michael Ellison is a former employee of Inova, where he worked for over three decades. Until August 2022, Mr. Ellison worked offsite in an entirely remote position as a Data Insight Lead in the Analytics Division.

15.    At all relevant times, Mr. Ellison was and is a citizen of the Commonwealth of Virginia and a resident of Winchester, Virginia.

16.    Andrea Graham is a former employee of Inova. Starting in March 2021, she worked as an Emergency Room Nurse at Inova Loudoun Hospital.

17.    At all relevant times, Ms. Graham was and is a citizen of the Commonwealth of Virginia and a resident of Winchester, Virginia.

18.    Arin Jenkins is a former employee of Inova. From February 2021 until September 2022, Mr. Jenkins worked as Nurse in the Surgical-Trauma Intensive Care Unit at Inova Loudoun Hospital.

19.    At all relevant times, Mr. Jenkins was and is a citizen of the Commonwealth of Virginia and a resident of Winchester, Virginia.

20.    Defendant Inova Health System Foundation ("IHSF") is a Virginia non-stock, nonprofit corporation with its principal place of business in Falls Church, Virginia. Inova is the parent company of Defendant Inova Health Care Services.

21.    Defendant Inova Health Care Services (collectively, with IHSF, "Inova") is a Virginia Nonstock Corporation with its principal place business in Falls Church, Virginia.

22.    Inova is Northern Virginia's largest non-profit health system. Its more than 20,000 employees, which Inova refers to as "team members," provide services at hospitals, care centers, and other healthcare facilities in Virginia and Maryland.

23.     Inova's 2020 fiscal year revenue exceeded $4.8 billion. That year, Inova's President/CEO J. Stephen Jones received over $4.3 million in compensation.

### INOVA'S MISCONDUCT

24.     In July 2021, Inova announced that all of its team members were required to be vaccinated against COVID-19 as a condition of remaining employed by Inova. Inova's vaccine mandate noted that it applied to all team members, including those "who are remote and do not hold patient-facing roles."

25.     To comply with the COVID vaccine mandate, Inova required team members to receive a single dose of the Johnson & Johnson vaccine, or a first dose of the Pfizer or Moderna vaccine, by September 1, 2021, and a second dose of the Pfizer or Moderna vaccine by October 1, 2021. Team members who did not meet these deadlines would be fired.

### Inova first offers religious employees "permanent" exemptions.

26.     Inova's initial COVID vaccine mandate announcement stated that all covered team members "may request an exemption from the COVID-19 vaccination requirement for medical or religious reasons."

27.     Hundreds of Inova employees did so.

28.     On information and belief, Inova reviewed these applications to assess whether each applicant indeed stated religious beliefs that were inconsistent with COVID vaccination, and whether and to what degree exempting each applicant from vaccination would impose a hardship on Inova's business.

29.     Inova then granted most of these employees permanent exemptions from the vaccine mandate, often within a few days of their application.

30.     Inova knew that employees with sincere religious objections to COVID vaccination might be reluctant to work at an employer who required vaccination, even under exemptions.

31.     Within days of receiving these applications, Inova sent letters to many exemption applicants making the following statements, with all emphases in the originals: "You have been approved for a **permanent** exemption from the COVID vaccine(s). You **will not** need to reapply for an exemption or supply additional paperwork in the future."

32.     Inova made these prompt offers of permanent exemptions in an attempt to induce employees with religious objections to COVID vaccination to continue working at Inova, despite its vaccine mandate, rather than seeking work at another employer with no similar mandate or with different policies and practices related to religious exemptions.

33.     Inova's exemption letters also explained in detail the additional precautionary measures that each unvaccinated team member should take in order to ensure safety.

### A few months later, Inova revokes the "permanent" exemptions.

34.     However, less than four months after granting these exemptions, in November 2021, Inova summarily revoked all medical exemptions from its COVID vaccine requirement. Inova announced that team members "who were previously granted a **permanent or temporary** medical exemption from the COVID vaccine **must now re-apply** under the new policy" that Inova was announcing. (emphases again in original).

35.     Inova also established a new Exemption Review Committee, separate from its previous exemptions panel, to "consider all exemption requests in light of the new policy."

36.     In February 2022, Inova did the same thing to team members with religious exemptions: it revoked all permanent religious exemptions to the vaccine requirement, and required team members to re-apply under the new policy and procedures.

37.     In an online "Team Member FAQs" that Inova posted during this time period, Inova acknowledged that it was violating its previous grants of "permanent" exemptions that would not require re-application. Inova's only explanation was a canned statement that its previous promises meant nothing for Inova's future decision-making. Specifically, Inova's FAQ stated:

> **21. I was already sent an approval for an exemption and was told I wouldn't need to reapply. Why is Inova going back on its word?**
> During these dynamic times in healthcare, we are continually reviewing and updating our approach to serving Inova's mission, vision and values and achieving our commitment to **Safe@Inova** for our team members and patients. Additionally, we are constantly evaluating the latest scientific evidence related to COVID-19, guidance from the CDC, and the data related to vaccine safety and efficacy. Consequently, our policies and decisions for maintaining the safety of team members and patients have and will likely continue to evolve and change as the relevant facts and circumstances warrant. Such updated policies and decisions have and will continue to apply to all team members.

38.     Although Inova suggested that government mandates required it to summarily revoke previously issued exemptions, this was false. All potentially applicable government regulations explicitly recognized that religious and other accommodations exempting employees from vaccination were required by law and could be provided safely.

**Inova allows unvaccinated workers to stay in their jobs for months
before issuing a one-size-fits-all denial of accommodations.**

39.     Inova knew that there was no real need for it to expel unvaccinated religious team members from its workforce. These team members had been working safely under vaccine exemptions for months, and nothing happened in 2022 that suddenly made them a greater danger.

40.     Accordingly, although Inova revoked religious exemptions *en masse* in February 2022, it did not treat the situation with anything resembling urgency.

41.     Inova allowed employees with revoked exemptions to continue working, unvaccinated, for several more months—until it began to deny accommodations and fire employees in the summer and into the fall of 2022.

42.     Inova claims it is entitled to judge religious accommodations subjectively and it created a process that allowed it to hide its reasons for denial and religious bias by intentionally

not recording or retaining records revealing the reasons for denying a particular employee's request.

43.    This also means that Inova has no records demonstrating whether any requested accommodation would have created any hardship on the conduct of its business.

44.    In fact, Inova did not engage in a genuine undue hardship analysis in response to religious accommodation/exemption requests.

45.    Inova unlawfully questioned the sincerity of Plaintiffs' and a class of employees' sincerely held religious beliefs.

46.    Instead of reviewing requests for accommodations individually, Inova implemented a policy of religious discrimination against a broad class of religious employees and applicants.

47.    Inova engaged in a pattern and practice of discrimination by denying accommodations to, and terminating, a class of employees on the basis of religion.

48.    Several months after receiving re-applications, Inova sent form letters denying accommodations without stating the reasons why a particular team member's application was deficient. Instead, the form letters stated generically, "Your request did not meet the criteria for exemption, did not demonstrate a sincerely held religious belief that conflicts with the vaccination requirement, or could not be accommodated in your role without posing an undue hardship to Inova's operations." Nothing in the form denial letter addressed any facts specific to the application or its denial

49.    Employees who attempted to appeal this decision, or otherwise tried to engage with Inova regarding their exemption requests, received no substantive response beyond another generic and conclusory denial of the request.

50.     The result was that, in the summer and fall of 2022, Inova fired many dozens—or even hundreds—of religious employees for failure to be vaccinated against COVID-19.

51.     Inova forced certain Inova employees to be vaccinated in violation of their religious beliefs.

52.     Upon information and belief, Inova has applied the same policy in order to engage in similar summary denials of job applicants' requests for religious exemptions, with the result that Inova has refused to hire dozens—if not hundreds—more religious job applicants.

### Inova's mass rejection of religious team members seriously harmed patient care.

53.     Inova knew that its summary revocation of exemptions and mass firing of unvaccinated team members was not necessary for workplace or patient safety. That is obvious from the fact that Inova fired even remote workers who were not physically present at Inova facilities. Indeed, Inova knew that a mass firing would *harm* patient care by exacerbating the existing critical shortage of Inova workers.

54.      By the time Inova fired its previously exempted unvaccinated team members in the summer and fall of 2022, it had a year's worth of experience with religious and medical accommodations from the COVID-19 vaccine, and with the numerous alternative precautions that could be used to ensure team member and patient safety.

55.     As a result, Inova knew that accommodations were available to allow unvaccinated team members to continue working with no more problems than the average worker.

56.     Inova's application of the vaccine policy to remote workers demonstrates that its mandate was not motivated by concerns about preventing COVID transmission between Inova employees or to Inova patients. Inova's explanations for its mandate invoked Inova's "values" and its desire to be "a leader" among peer health care organizations.

9

57.     By at least 2022, Inova knew that vaccinated and unvaccinated employees posed similar risks of COVID transmission. So, Inova shifted its public justification for its vaccine mandate. In so doing, Inova laid bare its unlawful bias.

58.     By the time Inova began terminating employees who it denied religious accommodations, Inova sought to justify its mandate (and by extension the denial of accommodations) as necessary to "minimize the risk of adverse outcomes (death and disability, hospitalization, and long-term 'long COVID') which impacts workforce availability and return to work. Team members who are vaccinated can return to work more quickly and have less of a chance of dying or becoming seriously ill."

59.     Inova knew this purported justification was factually unfounded. Data did not support a finding that Inova employees and applicants seeking religious accommodations were likely to be absent more than vaccinated employees.

60.     In fact, research published by the Mayo Clinic in 2021 showed that 9.1% of Mayo workers at its Rochester, Minnesota campus had to use to short-term disability "for lost work due to side effects" of vaccination after the company's "vaccination campaign."

61.     Even if Inova's purported justification was factually accurate, Inova has had many hundreds of open positions throughout 2021, 2022, and continuing in 2023. Inova has spent millions of dollars and has numerous personnel dedicated to recruiting to solve persistent staffing shortage.

62.     Inova has acknowledged a shortage of nurses and other professionals and staff for years.

63.     This problem exists across the health care industry, including in Virginia. According to data collected by the U.S. Department of Health and Human Services, on an average

day in 2021, roughly 20% of Virginia's hospitals reported a "Critical Staffing Shortage."

64.     Firing unvaccinated employees only made matters worse. In September 2021, the President of the American Hospital Association stated that mandatory vaccination of hospital employees "may result in exacerbating the severe workforce shortage problems that currently exist," and that hospitals and government needed "aggressive and creative strategies" to address this issue.

65.     In October 2021, staffing shortages forced Inova to close three of its urgent care clinics in Northern Virginia.

66.     In May 2022, Inova physicians published research proposing solutions for maintaining staffing levels with "increased demands, … a shortage of health care personnel resulting from a preexisting nursing shortage, staff illness with resultant quarantine, and burnout."

67.     In June 2022, an Inova leader was interviewed regarding the company's "long-term steps to recruit and retain nurses." She explained that "Inova Health's nurse educators and clinical leaders stayed available and visible to support their teams" and "creating that sense of purpose and belonging" among its nurses.

68.     Thus, Inova knew in the summer and fall of 2022 that it faced a critical shortage of staff to provide care and it desperately needed to retain its existing team members and hire more.

69.     As a result, Inova could not justify terminating dozens or hundreds of employees (i.e., making them permanently unavailable to work at Inova) based on a concern regarding their availability to work.

70.     Indeed, after firing dozens or even hundreds of team members, Inova faced an even deeper staffing crisis. Currently, Inova has no workers to fill nearly 1,600 open positions—

approaching 10% of its entire workforce—including in jobs that are essential to patient care and safety.

71.     The need is so great that Inova has offered incentives of $40,000 or more to nurses and other staff who relocate to join Inova.

72.     Firing unvaccinated religious team members thus created a significant burden on Inova's business. The only possible explanation for Inova's self-inflicted hardship is that its leaders believed these individuals' beliefs disqualified them from working for Inova.

### FACTS SPECIFIC TO THE INDIVIDUAL NAMED PLAINTIFFS

73.     While Plaintiffs Michael Ellison, Andrea Graham, and Arin Jenkins had different job duties, worked in different departments, and had different beliefs, Inova applied the same discriminatory policies and practices to all of them.

### Michael Ellison

74.     Mr. Ellison has a bachelor's degree in decision sciences and a master's degree in applied statistics. Inova hired him as a Quality Improvement Facilitator in September 1990.

75.     Mr. Ellison was one of Inova's longest-tenured employees. Over his three-plus decades of service at Inova, he held various positions in quality, outcomes management, and business intelligence, including Management Engineer, Senior Management Engineer, Senior Outcomes Analyst, and most recently Data Insight Lead.

76.     In these roles, Mr. Ellison supported the reporting of key hospital metrics, such as mortality rates, that contributed directly to patient care and safety. He co-authored articles demonstrating exemplary care at Inova, presented at conference, and regularly supported award-winning teams recognized for their "measurable results that significantly improve clinical quality,

service or patient safety." Mr. Ellison dedicated his career at Inova to helping teams improve quality of care for patients.

77.     For his accomplishments, Inova promoted Mr. Ellison multiple times. In his last two years at Inova Mr. Ellison received "exemplary" performance reviews, and in his last year at Inova he received a substantial merit-based pay increase.

78.     Mr. Ellison's position was fully remote. He worked from home and visited Inova's facilities at most once or twice annually.

79.     Mr. Ellison is also a Christian who believes in the sanctity of human life, that abortion is morally wrong, and that for him to support or benefit from it in any way would be a sin against God. Specifically, Mr. Ellison is required by his religious faith to reject any product or treatment that was developed or tested using cells or cell lines derived from aborted fetuses.

80.     It is widely recognized that all COVID vaccines available in the United States were tested or developed using cell lines derived from aborted fetuses. That is, at some point in the development or production history of each available vaccine, the manufacturer of the vaccine used cells that had been growing in a lab for decades, but that originated with tissue taken from an aborted fetus.

81.     Mr. Ellison also believes that accepting the vaccine violates Scripture's teaching regarding his personal accountability to God as steward of his body, mind, and spirit.

82.     Mr. Ellison was absent from working remotely due to COVID for two or three days. He did not file a claim for short-term disability.

83.     In response to Inova's July 2021 vaccine requirement, Mr. Ellison requested a religious exemption, explaining that his religious beliefs did not allow him to receive the currently

available COVID-19 vaccines because they all were "developed or tested using" cells that originated from abortions.

84. On August 10, 2021, Inova sent Mr. Ellison a letter stating that "You have been approved for a permanent exemption from the COVID vaccine(s). You will not need to reapply for an exemption or supply additional paperwork in the future."

85. For the next six-and-half months, Mr. Ellison continued to work at Inova, unvaccinated, in his fully remote position. On the one or two occasions when he visited an Inova facility, he abided by the safety protocols outlined in his approved accommodations.

86. On February 22, 2022, without explanation, Inova summarily revoked Mr. Ellison's permanent religious exemption.

87. Inova did not discuss with Mr. Ellison any concerns it had about continuing his permanent religious accommodation before revoking it. It did not state or explain whether the exemption had become an undue hardship on Inova, nor did Inova state or suggest that it had reason to believe that his religious beliefs had changed, or that there was no longer a conflict between his beliefs and the vaccine requirement.

88. Despite Inova's abrupt revocation of Mr. Ellison's exemption, Inova allowed Mr. Ellison to continue working in his fully remote position, unvaccinated, for *another* six months after the revocation.

89. Inova directed Mr. Ellison to reapply for a religious exemption, which he promptly did.

90. Unlike his first request for a religious exemption—which was evaluated and approved promptly—Inova did not decide Mr. Ellison's re-application for three months. Inova has never explained the reasons for its delay in considering his request for exemption.

91.     During this time, no one from Inova communicated with Mr. Ellison regarding his exemption, nor did Inova interact with Mr. Ellison in any way to identify a reasonable accommodation.

92.     Inova knew that granting Mr. Ellison's request would not have caused it any hardship.

93.     Nothing that Inova ever said or did with respect to Mr. Ellison indicated or suggested that Inova had individually considered his accommodation re-application, or had even read his re-application.

94.     Inova's Exemption Committee intentionally did not retain records of its decisions regarding Mr. Ellison's request.

95.     On June 17, 2022 Inova denied Mr. Ellison's second request for a religious exemption in a form letter. The letter's only explanation regarding Inova's refusal to grant Mr. Ellison's request for exemption stated:

> Dear Michael Ellison,
>
> After careful consideration by Inova's Exemption Review Committee, **your request for a religious exemption from Inova's vaccination requirement has been denied.** Your request did not meet the criteria for exemption, did not demonstrate a religious belief that conflicts with the vaccination requirement, or could not be accommodated in your role without posing an undue hardship to Inova's operations.

(emphasis in original.)

96.     When Mr. Ellison asked Inova's Human Resources department, in writing, why his request was denied, they responded, "Team Member Health and the Exemption Committee are not releasing specific reasons for denial."

97.     On June 30, 2022, Mr. Ellison appealed the Committee's denial, elaborating on his religious beliefs.

98.     By August 2022, Mr. Ellison had safely worked in his remote position at Inova, unvaccinated, for more than a year since the grant of his first exemption request.

99.     Nevertheless, on August 5, 2022, the Exemption Review Committee again denied his request and stated that "[t]his decision is final." They again did not explain why, offered the same conclusory menu of potential reasons for the denial, and informed Mr. Ellison that he had until August 19, 2022, to initiate vaccination or face termination.

100.    Mr. Ellison was constructively discharged because of his religious beliefs on August 22, 2021, ending his lengthy and successful 31-year career at Inova.

101.    Mr. Ellison filed a timely complaint of discrimination with the Office of the Attorney General of Virginia - Office of Civil Rights ("Office of Civil Rights") describing Inova's religious discrimination and failure to accommodate his religious beliefs.

102.    Mr. Ellison filed a timely charge of discrimination with the EEOC describing Inova's religious discrimination and failure to accommodate his religious beliefs.

103.    On December 21, 2022, the EEOC issued a Notice of Right-to-Sue, and Mr. Ellison timely brought this action.

104.    On March 31, 2023, the Office of Civil Rights issued a Notice of Right to File a Civil Action to Mr. Ellison, and he timely brought this action.

105.    Mr. Ellison has suffered damages as a result of Inova's unlawful termination of his employment.

### Andrea Graham

106.    Ms. Graham has a Bachelor of Science degree in Nursing. She has been a Registered Nurse since 2020.

107.    Inova hired Ms. Graham as a Staff Registered Nurse for Inova Loudoun Hospital's Emergency Room department in March 2021.

108.    Ms. Graham is a Christian and strives to closely adhere to Biblical principles in all areas of her life.

109.    Ms. Graham believes that her body does not belong to her because it was bought by the price of Jesus' sacrifice on the cross, and so God has authority over what she may or may not put into her body.

110.    Therefore, although Ms. Graham recognizes that modern medicine is valuable and effective in many circumstances, her faith requires her to refuse any particular form of medical treatment (especially one that involves physically ingesting any substance) unless and until she has sought and received God's permission to accept it, through prayer.

111.    Ms. Graham believes that accepting a medical treatment without receiving God's permission in this way would be deeply sinful and would jeopardize her potential for eternal life with God.

112.    These religious convictions lead Ms. Graham to favor natural healing methods over pharmaceutical ones, including multiple varieties of vaccine.

113.    Ms. Graham developed these religious beliefs over time, through prayer and study. In the early stages of Ms. Graham's development of these beliefs, she did receive some vaccines that she later came to regard as sinful. As she became more fully aware of her religious convictions, her conscience was troubled by these vaccinations, and she felt compelled to repent of them.

114.    Now that Ms. Graham is more fully aware of her religious convictions and responsibilities, she believes that receiving similar vaccines would be an even more grievous sin than before.

115.    Consequently, she has refused multiple vaccines, including the TDAP vaccine, MMR booster, influenza vaccine, and the COVID vaccine.

116.    When vaccines against COVID became available, Ms. Graham followed her religious beliefs and spent many hours in prayer, discerning whether God would approve of her receiving this vaccine. Ms. Graham believes that God answered her that vaccination was not His will, and commanded her not to receive vaccination.

117.    As part of Ms. Graham's Christian faith, she also believes in the sanctity of human life, that abortion is morally wrong, and that for her to support or benefit from it in any way would be a sin against God. Specifically, Ms. Graham is required by her religious faith to reject any product or treatment that was developed or tested using cells or cell lines derived from aborted fetuses.

118.    Moreover, Ms. Graham's sincere belief is that the Bible teaches that life begins at conception, that every life is sacred, that any action that might generate demand for aborted fetal cell tissue violates her core religious beliefs, and that she must not receive any benefit from a human being's life being taken by another person.

119.    It is widely recognized that all COVID vaccines available in the United States were tested or developed using cell lines derived from aborted fetuses. That is, at some point in the development or production history of each available vaccine, the manufacturer of the vaccine used cells that had been growing in a lab for decades, but that originated with tissue taken from an aborted fetus.

120.    Due to the COVID vaccines' connection with abortion, Ms. Graham therefore sincerely believes that receiving them would be a sin.

121.     When Inova first mandated the COVID-19 vaccine in 2021, it granted a temporary medical exemption to Ms. Graham in early August 2021 based on her plans to become pregnant. She therefore had no immediate need to seek a religious exemption.

122.     Inova later changed its policy to eliminate pregnancy exemptions from the vaccine requirement, and revoked Ms. Graham's exemption.

123.     Therefore, although Ms. Graham did become pregnant as she had planned, in March 2022 she requested a religious exemption and explained why receiving the COVID-19 vaccine would violate her religious beliefs. Ms. Graham's request explained in great detail her religious beliefs and her painstaking discernment of God's will for her regarding the COVID vaccine.

124.     Inova allowed Ms. Graham to continue working, unvaccinated, for months after revoking her exemption.

125.     During this time, no one from Inova communicated with Ms. Graham regarding her exemption, nor did Inova interact with Ms. Graham in any way to identify a reasonable accommodation.

126.     Inova knew that granting Ms. Graham's request would not have caused it any hardship.

127.     Ms. Graham's only absence from Inova related to COVID was when she was forced to be absent after Inova arbitrarily deemed her a higher risk than others when exposed to COVID at work because she was unvaccinated.

128.     Nevertheless, nothing that Inova ever said or did with respect to Ms. Graham indicated or suggested that Inova had individually considered her accommodation application, or had even read her application.

129.     Inova's Exemption Committee intentionally did not retain records of its decisions regarding Ms. Graham's request.

130.     On April 22, 2022, however, Inova's Exemption Review Committee denied Ms. Graham's religious exemption request in a form letter. The letter's only explanation regarding Inova's refusal to approve Ms. Graham's request for exemption was identical to Mr. Ellison's, stating:

> Dear Andrea Graham,
>
> After careful consideration by Inova's Exemption Review Committee, **your request for a religious exemption from Inova's vaccination requirement has been denied.** Your request did not meet the criteria for exemption, did not demonstrate a religious belief that conflicts with the vaccination requirement, or could not be accommodated in your role without posing an undue hardship to Inova's operations.

(emphasis in original.)

131.     On May 3, 2022, Ms. Graham re-applied for a religious exemption, which was denied on June 28, 2022. Again, the Committee only offered a menu of reasons for its denial and did not explain the reason for its denial.

132.     On July 11, 2022, Ms. Graham appealed the Committee's decision. On July 13, 2022, the Committee denied Ms. Graham's appeal and explained "[t]here is no process for a third review as a matter of course."

133.     By July 2022, Ms. Graham had safely worked at Inova, unvaccinated, for more than 11 months after Inova had granted her initial exemption.

134.     In July 2022, Ms. Graham went on maternity leave from her work at Inova.

135.     At the end of her maternity leave, Inova did not allow Ms. Graham to return to work because her religious beliefs prevented her from being vaccinated.

20

136. Inova placed Ms. Graham on administrative leave on November 30, 2022, and then discharged her on December 6, 2022, because of her religious beliefs.

137. Ms. Graham filed a timely charge of discrimination with the EEOC describing Inova's religious discrimination and failure to accommodate her beliefs, and stating that she had been informed she would not be allowed to return to work for Inova.

138. Inova's legal counsel's response to her charge reflected Inova's discriminatory animus toward Ms. Graham, asserting (without knowledge or evidence) that Ms. Graham's religious beliefs were not sincere and were insufficiently consistent to meet counsel's opinion regarding a legitimate religious belief.

139. On December 20, 2022, the EEOC issued a Notice of Right-to-Sue, and Ms. Graham timely brought this action.

140. Ms. Graham has suffered damages as a result of Inova's unlawful termination of her employment.

### Arin Jenkins

141. Mr. Jenkins has an Associate of Applied Sciences degree in nursing. He has been a Registered Nurse since 2003 and has twenty years of clinical experience.

142. After working for several other health care organizations, Mr. Jenkins was hired as a Staff Nurse in Inova's Surgical Trauma Intensive Care Unit in February 2021.

143. In this role, Mr. Jenkins was the second most experienced nurse in the department. He periodically served as the unit's Relief Charge Nurse, supervising the work of other nurses and directing patient care. Mr. Jenkins was also one of the designated preceptors for his unit, charged with orienting newly hired nurses to the role of Staff Nurse.

144.     Mr. Jenkins was never absent from work at Inova because he contracted COVID or because of an exposure at work.

145.     Mr. Jenkins also is a Christian who believes in the Bible as God's Holy Word. He was ordained a Christian pastor in 2002, around the same time he became a nurse.

146.     Mr. Jenkins views helping others in his nursing career as a natural extension of his religious faith. Indeed, at the beginning of the COVID pandemic, Mr. Jenkins traveled to New Jersey to serve in a COVID ICU for nine weeks.

147.     When Mr. Jenkins' colleagues in the hospital began missing time due to illness with COVID, he took on additional shifts to ensure that patients could receive the care they needed.

148.     Since his ordination in 2002, Mr. Jenkins has served continuously as a pastor (specifically, as a Youth or Worship Pastor). He has served in helping to found two different churches.

149.     At the time Mr. Jenkins applied to Inova for a religious exemption from COVID vaccination, he was an ordained pastor (specifically, the Worship and Music Leader) at Mosaic Church in Winchester, Virginia.

150.     As part of his Christian faith, Mr. Jenkins believes that the Holy Spirit dwells in him and guides him, and that he therefore must pray about every significant decision he makes, including decisions that affect his body and health. Specifically, Mr. Jenkins uses prayer to guide him in making choices that honor and glorify God, including choices about what substances like food or supplements he puts into his body. He believes that to go against the guidance of the Holy Spirit would be a sin, and that sin separates him from God.

151.     In seeking to follow God's guidance in this way, Mr. Jenkins has come as a matter of religious faith to favor natural methods of healing. Although Mr. Jenkins recognizes that

pharmaceutical medication can be valuable and effective in many circumstances, he feels called by God to use it only rarely.

152.    In particular, as a matter of religious principle and practice, Mr. Jenkins has declined all vaccinations of any kind for over a decade.

153.    Before Mr. Jenkins began working at Inova, multiple previous employers had recognized his religious beliefs and granted him religious exemptions from various vaccine and similar requirements.

154.    In response to Inova's July 2021 COVID vaccine requirement, Mr. Jenkins requested a religious exemption. He explained that "the Bible is my ultimate authority," that he is compelled to safeguard his body as God's temple, and that receiving a COVID vaccine would violate his conscience and would be a sin against God.

155.    On July 21, 2021, Inova approved Mr. Jenkins "for a permanent exemption" from its COVID vaccine requirement. After Inova corrected a clerical error, the accommodation letter stated (with emphases in original): "You have been approved for a **permanent** exception from the **COVID & FLU** vaccine(s). You **will not** need to reapply for an exemption or supply additional paperwork in the future."

156.    For the next six months, Mr. Jenkins continued to work at Inova, unvaccinated, while abiding by safety protocols such as masking, social distancing, and departmental PPE requirements.

157.    In February 2022, without explanation, Inova summarily revoked Mr. Jenkins's permanent religious exemption.

158.    Inova did not discuss with Mr. Jenkins any concerns it had about continuing his permanent religious accommodation before revoking it. Nor did it state or explain to Mr. Jenkins

whether he had become an undue hardship on the conduct of Inova's business, whether Inova had reason to believe that his religious beliefs had changed, or whether there might no longer be a conflict between his religious beliefs and Inova's vaccine requirement.

159.   Despite Inova's abrupt revocation of Mr. Jenkins's exemption, Inova allowed him to continue working, unvaccinated, for *another* six months after the revocation.

160.   Inova directed Mr. Jenkins to reapply for a religious exemption, which he promptly did.

161.   Unlike his first request for a religious exemption—which was evaluated and approved promptly—Inova did not decide Mr. Jenkins's exemption request for nearly four months. Inova has never explained the reasons for its delay in considering his request for exemption.

162.   During this time, no one from Inova communicated with Mr. Jenkins regarding his exemption, nor did Inova interact with Mr. Jenkins in any way to identify a reasonable accommodation.

163.   Inova knew that granting Mr. Jenkins's request would not have caused it any hardship.

164.   Nothing that Inova ever said or did with respect to Mr. Jenkins indicated or suggested that Inova had individually considered his accommodation re-application, or had even read his re-application.

165.   Inova's Exemption Committee intentionally did not retain records of its decisions regarding Mr. Jenkins's request.

166.   By July 2022, Mr. Jenkins had worked safely at Inova, unvaccinated, for a whole year after Inova had granted his initial exemption request.

167.    Nevertheless, on July 22, 2022, Inova denied Mr. Jenkins's second request for a religious accommodation in a form letter. The letter's only explanation regarding Inova's refusal to approve Mr. Jenkin's request was identical to Ms. Graham's and Mr. Ellison's, stating:

> Dear Arin Jenkins,
>
> After careful consideration by Inova's Exemption Review Committee, **your request for a religious exemption from Inova's vaccination requirement has been denied.** Your request did not meet the criteria for exemption, did not demonstrate a religious belief that conflicts with the vaccination requirement, or could not be accommodated in your role without posing an undue hardship to Inova's operations.

(emphasis in original.)

168.    Although Inova told Mr. Jenkins he would be fired on August 5, 2022 if he was still unvaccinated, it did not inform Mr. Jenkins's direct supervisor until shortly before the August 5 deadline.

169.    Mr. Jenkins's supervisor was unable to find a replacement for him—especially a replacement with his extensive experience—so she arranged to continue Mr. Jenkins's employment until August 23, 2022.

170.    Indeed, Mr. Jenkins's supervisor specifically acknowledged in writing that there had been no hardship to Inova from Mr. Jenkins's not being vaccinated against COVID. She also recognized that his *absence* caused a substantial hardship to Inova's Surgical Trauma Intensive Care Unit.

171.    Despite this, Inova placed Mr. Jenkins on unpaid leave on August 23, 2022, and discharged him on September 1, 2022, because of his religious beliefs.

172.    Mr. Jenkins also filed a timely complaint of discrimination with the Office of Civil Rights describing Inova's religious discrimination and failure to accommodate his religious beliefs.

173.    Mr. Jenkins filed a timely charge of discrimination with the EEOC describing Inova's religious discrimination and failure to accommodate his religious beliefs.

174.    On December 21, 2022, the EEOC issued a Notice of Right-to-Sue, and Mr. Jenkins timely brought this action.

175.    On March 31, 2023, the Office of Civil Rights issued a Notice of Right to File a Civil Action to Mr. Jenkins, and he timely brought this action.

176.    Mr. Jenkins has suffered damages as a result of Inova's unlawful termination of his employment.

### Investigation and Findings of the Virginia Office of Civil Rights

177.    In response to complaints filed by Mr. Ellison, Mr. Jenkins, and more than forty other Complainants regarding Inova, Virginia Attorney General Jason Miyares through the Office of Civil Rights investigated Inova's revocation of, and refusal to grant, religious accommodations.

178.    After months of investigating, in January 2023, the Office of Civil Rights concluded "there is reasonable cause to believe [Inova] violated the VHRA and Title VII by denying accommodation to and terminating a class of employees on the basis of religion."

179.    The Office of Civil Rights also found evidence that Inova:

- "unlawfully denied Complainants' requests for an exemption from its vaccine mandate."

- "unlawfully questioned the sincerity of Complainants' sincerely held religious beliefs without a lawful basis."

- "failed to properly engage in the interactive process with Complainants to determine whether it could accommodate Complainants' religious beliefs".

- "discharged and constructively discharged [Complainants] because of their religious beliefs in violation of the VHRA and Title VII."

- failed to "engage[] in a proper undue hardship analysis ...."

26

(Exhibit A.)

180.    The Office of Civil Rights concluded:

[Inova]'s Religious Exemption Committee and three executive decision-makers implemented a policy of religious discrimination by unlawfully denying Complainants and similarly situated employees their requested religious accommodation to be exempt from [Inova]'s vaccine mandate. The denial of accommodation by the same Religious Exemption Committee and the same three executive decision-makers forced certain Complainants and similarly situated employees to be vaccinated in violation of their religious beliefs. The same Religious Exemption Committee and the same three executive decision-makers terminated Complainants and similarly situated employees on the basis of religion. Therefore, there is reasonable cause to believe [Inova] violated the VHRA and Title VII by engaging in a pattern or practice of discrimination in denying accommodation to and terminating a class of employees on the basis of religion.

(*Id.*)

## CLASS ALLEGATIONS

181.    Plaintiffs seek to represent and have certified two classes of plaintiffs: a Religious Discrimination Class of persons who were denied religious accommodations, and a Permanent Exemption Class of persons to whom Inova promised permanent exemptions that it summarily and unlawfully revoked.

### *Religious Discrimination Class*

182.    The Religious Discrimination Class, represented by all Named Plaintiffs, consists of individuals who, at any time before the entry of judgment in the case:

(1) Were, or applied to be, non-volunteer Inova team members; and

(2) Requested that Inova accommodate their religious beliefs by exempting them from receiving a COVID-19 vaccine; and

(3) After requesting the exemption, either:

a.  were fired, suspended, disciplined, or subjected to any adverse employment action by Inova as a result of not receiving a COVID-19 vaccine, or

     b.  after having an exemption denied or revoked by Inova, resigned rather than receive the vaccine; or

     c.  were not hired by Inova to a position for which they applied and for which they met the listed qualifications.

183.    Plaintiffs estimate the class to contain more than 100 members, and possibly multiple hundreds of members, rendering the class so numerous that joinder of all members is impracticable.

184.    There are significant questions of law and fact common to the class, including:

- Whether summarily revoking or denying religious exemptions, without first discussing the revocation or denial with each individual employee and without evaluating the employee's circumstances, was a violation of Inova's duty to accommodate sincerely held religious beliefs;

- Whether Inova adopted a policy and practice of uniformly rejecting religious-exemption requests from its COVID vaccine requirement, without any individualized good-faith consideration of the employee's proposed accommodations;

- Whether Inova complied with its obligations under Title VII to engage in the interactive process when responding to each accommodation request;

- Whether Inova discriminated against class members on the basis of their religion, in violation of Title VII;

- Whether an unvaccinated employee can engage in reasonable workplace precautions that make him or her no more likely (or less likely) to transmit COVID-19 in the workplace than the same employee who receives the vaccine; and

- Whether Inova's failure to offer reasonable accommodations was religious discrimination in violation of Title VII.

185.    The named Plaintiffs' claims are typical of the claims of the other class members. Like the rest of the class, each named Plaintiff requested a religious exemption, had the exemption summarily denied without any explanation, and was forced to stop working at Inova due to the exemption denial.

186.    The named Plaintiffs will fairly and adequately protect the interests of the class. Their interests in this matter are the same as those of the class, and they have no conflict of interest with the class.

187.    Inova has acted on grounds that apply generally to the class because, as against each class member, it has taken adverse employment actions by summarily revoking religious exemptions, by failing to engage in the legally required interactive process, and by failing to otherwise give good-faith consideration to the class members' requests for religious accommodations. As a result, final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

188.    Questions of law or fact common to members of the class predominate over any questions affecting only class members. Because Inova summarily and systematically denied requests for religious accommodations, the lawfulness of its actions can be determined in common for the entire class. In addition, a large portion of the damages due to class members consists of back pay or other lost wages, which can be calculated mechanically based on records maintained by Inova.

189.    A class action is superior to other available methods for fairly and efficiently adjudicating the claims of class members. Inova discriminated against all class members in exactly the same way, and through the application of a uniform policy. Therefore, individual litigation of class members' claims would involve repeated re-litigation of the same questions.

### *Permanent Exemption Class*

190.    The Permanent Exemption Class, represented by Named Plaintiffs Michael Ellison and Arin Jenkins, consists of individuals who, at any time before the entry of judgment in this case:

(1) Were, or applied to be, non-volunteer Inova team members; and

(2) Received a written commitment from Inova that Inova had granted them an exemption from the COVID vaccine requirement that was "permanent" and/or that would not require them to reapply or submit additional paperwork in the future; and

(3) After receiving that written commitment, began or continued working at Inova without receiving a COVID-19 vaccine; and

(4) After receiving the written commitment:

    a.  were fired, suspended, disciplined, or subjected to any adverse employment action by Inova as a result of not receiving a COVID-19 vaccine; or

    b.  resigned rather than receive the vaccine after Inova either (i) revoked their exemption or (ii) informed them it intended to take adverse action against them as a result of their not receiving a COVID vaccine; or

    c.  were not hired by Inova to a position for which they applied and for which they met the listed qualifications.

191.    The class includes many dozens or even hundreds of members, rendering the class so numerous that joinder of all members is impracticable.

192.    There are significant questions of law and fact common to the class, including:

• Whether Inova and its employees entered valid and binding contracts prohibiting Inova from revoking COVID-19 vaccine exemptions;

• Whether Inova breached these contracts by revoking class members' exemptions; and

• Whether any intervening development somehow excused that mass breach.

193.    The class representatives' claims are typical of the claims of other class members. Like the rest of the class, Messrs. Ellison and Jenkins each received an exemption that Inova promised was "permanent," and each was forced to stop working at Inova when Inova callously broke its word and revoked the exemption.

194.    The class representatives will fairly and adequately protect the interests of the class. Their interests in this matter are the same as those of the class, and they have no conflict of interest with the class.

195.    Inova has acted on grounds that apply generally to the class because, as against each class member, it expressly promised permanent exemptions and then flagrantly broke that promise. As a result, final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

196.    Questions of law or fact common to members of the class predominate over any questions affecting only class members. Because Inova uniformly promised "permanent" exemptions and then systematically broke that promise, the lawfulness of its actions can be determined in common for the entire class. In addition, a large portion of the damages due to class members consists of back pay or other lost wages, which can be calculated mechanically based on records maintained by Inova.

197.    A class action is superior to other available methods for fairly and efficiently adjudicating the claims of class members. Inova discriminated against all class members in exactly the same way, and through the application of a uniform policy. Therefore, individual litigation of a class members' claims would involve repeated re-litigation of the same questions.

### *All non-volunteer team members covered by the vaccine mandate were Inova employees.*

198.    Inova applied and applies its employment policies, including its COVID vaccine requirement, to all "team members," which it defines to include "Inova-employed team members, employed and affiliated physicians, contractors, travel nurses, students, residents, fellows, and volunteers" regardless of whether they were "classified as full-time, part-time, temporary or PRN status, and regardless whether [*sic*] … work[ing] on-site at any Inova location or remotely."

199.    All non-volunteer team members covered by Inova's COVID vaccination requirement are (and were) employees of Inova.

200.    At all relevant times, Inova has been fully aware of that fact.

201.    Inova was similarly aware that Title VII requires it to provide reasonable accommodations for team members with religious beliefs, practices, or observances that conflict with its COVID vaccine requirement.

202.    Some team members covered by the COVID vaccine requirement may be, or may have been, joint employees of both Inova and other entities. These team members remain employees of Inova because:

a.   Inova had authority, or effective authority, to hire or fire them by allowing to provide service, or prohibiting them from providing service, at the Inova facilities where they work.

b.   Inova controlled their day-to-day activities and the manner and means by which they perform them: it assigned them work involving the provision of services to Inova and for Inova patients, it established the policies and procedures they must follow, and it had the right to discipline them.

c.   Inova furnished the tools, equipment, and facilities for their work.

d.   Inova controlled the records relating to their work.

e.   Inova provided training for them and required them to attend the training.

f.   Inova held them out as Inova employees: it introduced them to patients as Inova team members, it provided them Inova email addresses, and it took other similar actions.

g.   They performed services similar to those of other Inova employees.

h.   Many of them worked only for Inova for years.

<u>COUNT I</u>
*By the Religious Discrimination Class*
**Religious Discrimination, Failure to Interact, and Failure to Accommodate Religious Beliefs, Practices, or Observances in Violation of Title VII of the Civil Rights Act of 1964**

203.    The named Plaintiffs and the Religious Discrimination Class re-allege each of the foregoing paragraphs.

204.    Inova is an "employer" within the meaning of 42 U.S.C § 2000e(b).

205.    Title VII prohibits discrimination on the basis of religion in hiring or firing employees, *id*. § 2000e-2, and requires employers to reasonably accommodate their employees' and job applicants' sincerely held religious beliefs. *Id*. § 2000e(j).

206.    Named Plaintiffs and each class member were employees of Inova, or applicants for positions at Inova, who held sincere religious beliefs that prevented them from receiving any COVID-19 vaccine.

207.    Named Plaintiffs and each class member informed Inova of the conflict between their religious beliefs and Inova's vaccine requirement.

208.    Title VII requires that requests for reasonable accommodation be considered based on the applicant's individual, particularized circumstances, and that any claim of undue hardship by the employer be assessed on a case-by-case basis rather than through a rote or blanket application of company policy, including vaccine mandates.

209.    When an employee or job applicant requests an accommodation, Title VII requires that employers engage in a good faith interactive process whereby the employer and employee work together, exchanging information, with the goal of identifying an effective and reasonable accommodation.

210.    Inova violated Title VII by discriminating against named Plaintiffs and each class member on the basis of religion, including through its policies and practices that discriminated against employees and job applicants who sought religious accommodations exempting them from Inova's COVID vaccine requirement.

211.    Inova violated Title VII by summarily revoking religious exemptions, by failing to interact, by failing to consider available accommodations, and by failing to engage in a good-faith effort to determine if a reasonable accommodation was available that could eliminate the conflict between Inova's COVID vaccine requirement and the religious beliefs, practices, or observances of the named Plaintiffs and class members.

212.    Inova also violated Title VII by its failure to reasonably accommodate named Plaintiffs' and class members' sincerely held religious beliefs, practices, or observances that conflicted with Inova's COVID vaccine requirement, even though such accommodation would not have created an undue hardship on Inova's business as defined in Title VII.

213.    Inova violated Title VII by questioning the sincerity of Plaintiffs' and other employees' sincerely held religious beliefs without a lawful basis.

214.    Inova violated Title VII because it did not engage in a genuine undue hardship analysis in response to religious accommodation/exemption requests.

215.    Inova violated Title VII because it implemented a policy of religious discrimination against a broad class of religious employees and applicants

216.    Inova violated Title VII because its denial of accommodations forced certain Inova employees to be vaccinated in violation of their religious beliefs.

217.    Inova violated Title VII by engaging in a pattern and practice of discrimination in denying accommodation to and terminating a class of employees on the basis of religion.

218.    Inova violated Title VII by refusing to retain records related to religious accommodation decisions.

219.    Inova violated Title VII by subjectively judging employees' religious beliefs and requests for accommodation without any lawful basis.

220.    Inova violated Title VII by creating a process for considering religious accommodation requests intended to allow its legal counsel to create false, *post hoc* justifications to mask anti-religious bias.

221.    Inova violated Title VII by mandating that employees be affiliated with and subject to a "clergy/religious leader" in order to receive a religious accommodation.

222.    Inova violated Title VII by mandating that employees demonstrate an "objection to the vaccination requirement."

223.    Inova violated Title VII by mandating that employees demonstrate that its mandate "substantially burden[ed]" their "religious exercise," rather than merely showing a "conflict" with a religious observance, practice, or belief.

224.    Inova violated Title VII and cannot demonstrate any undue hardship because it did not genuinely analyze whether employees posed an undue hardship. If it had done so, it would have recognized that Plaintiffs and other religious employees could have remained employed without posing an undue hardship on the conduct of its business.

225.    The lack of any undue hardship from religious accommodations is demonstrated by (among other things) Inova's previous grant of accommodations to Named Plaintiffs and to many class members, and by Inova's willingness to allow the Named Plaintiffs and many class members to continue working, unvaccinated, for many months after they applied for exemptions.

226.    Inova engaged in religious discrimination against Named Plaintiffs and each class member by revoking religious exemptions, and by designing unlawful policies and practices that systematically denied future requests for religious accommodations from its COVID vaccine requirement.

227.    As a result, Inova fired, refused to hire, or otherwise took adverse employment action against each member of the Religious Discrimination Class.

228.    Had Inova interacted with Named Plaintiffs and the other Class members in good faith about their requests, it would quickly have realized that reasonable measures were available to accommodate class members' religious beliefs while imposing no burden or a *de minimis* burden on Inova.

229.    Inova failed to offer any reasonable accommodation to any class member, instead firing or refusing to hire each of them. Inova's actions constitute discrimination on the basis of religion and failure to accommodate, all in violation of 42 U.S.C §§ 2000(e)-2 and 2000(e)(j).

230.    Because of Inova's unlawful actions, named Plaintiffs and members of the Religious Discrimination Class have suffered and continue to suffer economic and other damages in amounts to be proven at trial, including front pay, back pay, emotional distress damages, compensatory damages, punitive damages, and attorneys' fees.

### COUNT II
*By the Religious Discrimination Class*
**Religious Discrimination, Failure to Interact, and Failure to
Accommodate Religious Beliefs, Practices, or Observances
in Violation of the Virginia Human Rights Act**

231.    The named Plaintiffs and the Religious Discrimination Class re-allege each of the foregoing paragraphs.

232.   The VHRA protects all persons in Virginia from unlawful discriminatory employment practices, and makes it unlawful to "refuse to hire, discharge, otherwise discriminate against any individual" on the basis of religion. Va. Code § 2.2-3905(B)(1)(a).

233.   Under the VHRA, an "unlawful discriminatory practice" is defined as "[c]onduct that violates any Virginia or *federal* statute," including Title VII. Va. Code 2.2-3902 (emphasis added).

234.   Named Plaintiffs and each class member were employees of Inova, or applicants for positions at Inova, who held sincere religious beliefs that prevented them from receiving any COVID-19 vaccine.

235.   Named Plaintiffs and each class member informed Inova of the conflict between their religious beliefs and Inova's vaccine requirement.

236.   The VHRA requires that requests for reasonable accommodation be considered based on the applicant's individual, particularized circumstances, and that any claim of undue hardship by the employer be assessed on a case-by-case basis rather than through a rote or blanket application of company policy, including vaccine mandates.

237.   When an employee or job applicant requests an accommodation, the VHRA requires that employers engage in a good faith interactive process whereby the employer and employee work together, exchanging information, with the goal of identifying an effective and reasonable accommodation.

238.   Inova violated the VHRA by discriminating against Named Plaintiffs and each class member on the basis of religion, including through its policies and practices that discriminated against employees and job applicants who sought religious accommodations exempting them from Inova's COVID vaccine requirement.

239.    Inova violated the VHRA by summarily revoking religious exemptions, by failing to interact, by failing to consider accommodations, and by failing to engage in a good-faith effort to determine if a reasonable accommodation was available that could eliminate the conflict between Inova's COVID vaccine requirement and the religious beliefs, practices, or observances of the Named Plaintiffs and class members.

240.    Inova violated the VHRA by questioning the sincerity of Plaintiffs' and other employees sincerely held religious beliefs without a lawful basis.

241.    Inova violated the VHRA because it did not engage in a genuine undue hardship analysis in response to religious accommodation/exemption requests.

242.    Inova violated the VHRA because it implemented a policy of religious discrimination.

243.    Inova violated the VHRA because its denial of accommodations forced certain Inova employees to be vaccinated in violation of their religious beliefs.

244.    Inova violated the VHRA by engaging in a pattern and practice of discrimination in denying accommodation to and terminating a class of employees on the basis of religion.

245.    Inova violated the VHRA by refusing to retain records related to religious accommodation decisions.

246.    Inova violated the VHRA by subjectively judging employees' religious beliefs and requests for accommodation without any lawful basis.

247.    Inova violated the VHRA and cannot demonstrate any undue hardship because it never even tried to analyze whether any employee posed an undue hardship.

248.     Inova violated the VHRA by creating a process for considering religious accommodation requests intended to allow its legal counsel to create false, *post hoc* justifications to mask anti-religious bias.

249.     Inova violated the VHRA by mandating that employees be affiliated with and subject to a "clergy/religious leader" in order to receive a religious accommodation.

250.     Inova violated the VHRA by mandating that employees demonstrate an "objection to the vaccination requirement."

251.     Inova violated the VHRA by mandating that employees demonstrate that its mandate "substantially burden[ed]" their "religious exercise," rather than merely showing a "conflict" with a religious observance, practice, or belief.

252.     Inova also violated the VHRA by its failure to reasonably accommodate Named Plaintiffs' and class members' sincerely held religious beliefs, practices, or observances that conflicted with Inova's COVID vaccine requirement, even though such accommodation would not have created an undue hardship on Inova's business as defined in the VHRA.

253.     The lack of any undue hardship from religious accommodations is demonstrated by (among other things) Inova's previous grant of accommodations to Named Plaintiffs and to many class members, and by Inova's willingness to allow the Named Plaintiffs and many class members to continue working, unvaccinated, for many months after they applied for exemptions.

254.     Nevertheless, Inova engaged in religious discrimination against Named Plaintiffs and each class member by revoking religious exemptions, and by designing unlawful policies and practices that systematically denied future requests for religious accommodations from its COVID vaccine requirement.

255.     As a result, Inova fired, refused to hire, or otherwise took adverse employment action against each member of the Religious Discrimination Class.

256.     Had Inova interacted with Named Plaintiffs and the other Class members in good faith about their requests, it would quickly have realized that reasonable measures were available to accommodate class members' religious beliefs while imposing no burden or a *de minimis* burden on Inova.

257.     Inova failed to offer any reasonable accommodation to any class member, instead firing or refusing to hire each of them. Inova's actions constitute discrimination on the basis of religion and failure to accommodate, all in violation of the VHRA.

258.     Because of Inova's unlawful actions, Named Plaintiffs and members of the Religious Discrimination Class have suffered and continue to suffer economic and other damages in amounts to be proven at trial, including front pay, back pay, emotional distress damages, compensatory damages, punitive damages, and attorneys' fees.

<u>COUNT III</u>
*By the Permanent Exemption Class*
**Breach of Contract**

259.     Mr. Ellison, Mr. Jenkins, and the Permanent Exemption Class re-allege each of the foregoing paragraphs.

260.     After Inova announced that COVID-19 vaccination was a condition of employment for everyone who worked there, team members who could not receive a COVID-19 vaccine had reason to seek other work and leave Inova.

261.     Inova made a written offer to each member of the Permanent Exemption Class that, if they continued working at Inova, Inova would not enforce its vaccine requirement against them,

40

and this exemption was "permanent" and would not require class members to submit any re-application or additional paperwork in the future.

262.    Inova made this offer, and class members understood that Inova was making this offer, to induce them to continue working at Inova rather than seeking different employment in an attempt to honor their religious beliefs.

263.    Each member of the Permanent Exemption Class accepted this offer by reporting to work at Inova rather than taking work with another employer that did not require COVID-19 vaccines.

264.    In the alternative, Inova is estopped from denying that its written promise constitutes a valid contract, because Inova made the promise intending that each class member would rely on it by continuing to report to work at Inova rather than accepting other employment, and each class member did so rely.

265.    Inova breached its contractual duties by revoking the "permanent" exemptions, requiring class members to re-apply for accommodations, and ultimately taking adverse action against them as a result of their not being vaccinated.

266.    Because of Inova's unlawful actions, Mr. Ellison, Mr. Jenkins, and members of the Permanent Exemption Class have suffered and continue to suffer economic and other damages in amounts to be proven at trial, including front pay, back pay, emotional distress damages, compensatory damages, punitive damages, and attorneys' fees.

## JURY DEMAND

Named Plaintiffs and the Classes demand a trial by jury on all claims and issues for which they have a right to trial by jury.

**PRAYER FOR RELIEF**

WHEREFORE, Named Plaintiffs and the Classes pray for judgment against Inova and that this Court:

A. Adjudge, decree, and declare that Inova is liable to Named Plaintiffs and Class members for their actual damages in amounts to be proven at trial, including back pay, front pay, emotional distress and pain and suffering, compensatory damages, punitive damages, interest, and any other damages or penalties available at law or in equity;

B. Order and enjoin that Inova grant exemptions from COVID vaccination to all Class members, reinstate the employment status of any Class member who requests it (with no diminishment in seniority), and reconsider any pending job applications by Class members without attaching any negative weight to their COVID vaccination status;

C. Award Named Plaintiffs and Class members their costs, damages, reasonable attorneys' fees, prejudgment interest, and any other relief permitted by statute or regulation; and

D. Award such other or further relief as the Court may deem necessary, proper, just or equitable.

Dated:  September 22, 2023

Respectfully submitted,

**MICHAEL ELLISON, ANDREA GRAHAM, AND ARIN JENKINS**

By their Counsel:

_s/Charles B. Molster, III_____
Charles B. Molster, III (VSB#23613)
Law Offices of Charles B. Molster, III PLLC
2141 Wisconsin Avenue, N.W., Ste. M
Washington, D.C. 20007
Tel. (703) 346-1505
Email: cmolster@molsterlaw.com

Samuel W. Diehl (admitted *pro hac vice*)
Nicholas J. Nelson (admitted *pro hac vice*)
CROSSCASTLE PLLC
333 Washington Avenue N.
Ste 300-9078
Minneapolis, MN 55401
Tel: (612) 429-8100
Fax: (612) 234-4766
Email: sam.diehl@crosscastle.com
           nicholas.nelson@crosscastle.com

4874-3696-4481, v. 1