**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| Michael ELLISON, Andrea GRAHAM, and Arin JENKINS, on behalf of themselves and all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 1:23-cv-00132 MSN-LRV |
| v. | ) ) | |
| INOVA HEALTH SYSTEM FOUNDATION, and INOVA HEALTH CARE SERVICES, | ) ) ) | |
| Defendants. | ) ) | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO**
**INOVA'S MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

Federal law requires employers to accommodate their employees' religious practices. Defendants (hereinafter "Inova") failed to do that for Plaintiffs Michael Ellison and Andrea Graham. Mr. Ellison and Ms. Graham are former Inova employees. They also are Christians who believe abortion is a sin and who, consistent with that religious belief, avoid the use of products associated with abortion. For that reason, Plaintiffs asked Inova to exempt them from its requirement that all employees be vaccinated against COVID-19. Inova refused, although it offered no explanation why. Inova fired Ms. Graham for being unvaccinated, and Inova told Mr. Ellison it would fire him if he were not vaccinated by August 19, 2022. On August 20, Mr. Ellison resigned to avoid being fired.

Inova's attempts to avoid a jury trial on this failure to accommodate its employees' religious beliefs are unpersuasive. Inova repeats its contention from previous briefing that Ms. Graham's EEOC charge did not complain about her firing, and so she is not allowed to sue based on it. Every time Inova has briefed this issue, Ms. Graham has pointed out that her EEOC charge ***specifically said*** that Inova would be firing her for being unvaccinated. That easily satisfies the applicable legal standard, which is markedly lenient.

Inova next contends that Ms. Graham was or is lying about her religious beliefs and their conflict with COVID vaccination. This argument is badly out of place on a motion for summary judgment. Ms. Graham expressly told Inova that she does not take to a wide variety of medications on religious grounds related to Christian teachings on abortion. As her declaration demonstrates, Ms. Graham will testify to the jury in detail about how she developed this religious belief and the significant effects it has had on her life. If Inova wants to argue that Ms. Graham's written notice to Inova and her testimony in this case are lies she concocted to cover some non-religious objection to COVID vaccination, it can make that argument to the jury. But Inova cannot possibly win summary judgment by asking the Court to foreclose the jury's role and determine credibility based solely on Inova's argument.

Inova's third contention is that it could fire Plaintiffs because they do not properly understand their own religious principles. Inova claims that neither Mr. Ellison nor Ms. Graham really have religious objections to receiving one particular kind of COVID-19 vaccine, made by a company called "Novavax." Mr. Ellison and Ms. Graham say the opposite: both of them expressly asked Inova for an exemption from receiving *any* COVID-19 vaccine. And although the Novavax vaccine was not available at the time they submitted their applications to Inova, in this litigation both Mr. Ellison and Ms. Graham have filed detailed declarations explaining that their abortion-related religious objections to COVID-19 vaccination include the Novavax vaccine. Inova contends that this must not be true because the Novavax vaccine supposedly has no association with abortion whatsoever—but Inova's only purported support for that contention is inadmissible hearsay statements consisting of Novavax's own efforts to promote its product. At bottom, the nature and scope of Plaintiffs' religious beliefs is not for Inova to decide; it is for Plaintiffs themselves. Plaintiffs have filed their own separate motion for summary judgment on the issue of whether their asserted objections conflict with Inova's COVID-19 vaccine requirement. The Court should grant that motion and deny Inova's motion.

Finally, Inova contends that no jury could find Mr. Ellison to have suffered an adverse employment action because he resigned in lieu of termination. The law is squarely the opposite. Discrimination claims arise when an employee learns he will fired. They need not wait until all effects of that decision have come to fruition. This does not change when an employee seeks alternative employment after being informed he will be fired. The law is clear that this presents, at least, a fact question regarding constructively discharged. That is exactly what happened here to Mr. Ellison.

The Court should deny Inova's motion for summary judgment, grant Plaintiffs' motion for partial summary judgment, and set the remaining issues for trial.

**STATEMENT OF GENUINE ISSUES TO BE LITIGATED**

Plaintiffs dispute the following facts listed in Inova's brief:

4. Plaintiffs dispute that "[a]ll team members" at Inova "are required to be vaccinated." As Inova's brief concedes, it is required by law to offer certain medical and religious accommodations to its vaccine requirements. (*See* Dkt. 118 at 20.)

13. Plaintiffs dispute that, "[u]ntil late 2021," Inova's Team Member Health department "typically" granted religious accommodation requests "without following any formal evaluative process." Inova human-resources executive Laura Luca testified in this case that she personally reviewed every religious accommodation request until late 2021, and decided whether to approve or deny them depending on whether "they met the requirements of the policy" in place at the time. (Dkt. 118-10 at 33-34.)

76. Plaintiffs dispute that "Novavax represented" that its vaccine "was ***not*** developed using fetal cell lines." Inova's Exhibit 47 contains a statement from Novavax that "No human fetal-derived cell lines or tissue are contained in the Novavax COVID-19 Vaccine, Adjuvanted or used in its development, manufacture or release testing." That document speaks for itself. The FDA statement to which Inova purportedly cites (which is not available at the weblink Inova provides) does not address or discuss the Novavax vaccine's relationship to fetal cell lines.[1]

To any extent that Inova asserts that the Novavax vaccine *in fact* was not developed using fetal cell lines, Plaintiffs also dispute this. Inova's Exhibit 47 is inadmissible hearsay if offered for that purpose, and Inova has presented no other admissible evidence that could establish these facts. Plaintiffs have submitted statements from trustworthy organizations describing legitimate

---

[1] It appears that the FDA no longer has the announcement cited by Inova posted on its website (and has not for several months). As best Plaintiffs can tell, a cached version of the historic FDA website appears at https://cc.bingj.com/cache.aspx?q=U.S.+Food+and+Drug+Administration%2c+FDA+Authorizes+Emergency+Use+of+Novavax+COVID-19+Vaccine%2c&d=4799574775105278&mkt=en-US&setlang=en-US&w=kFBBptrRNiWGmAU-uvN1BU_luSBB_uMn1.

concerns that the Novavax vaccine was indeed tested using fetal cell lines. *See* Dkt. 121-14, 121-15, 121-16, 121-17.

77. Plaintiffs dispute the truth of all of the statements contained in Inova's Exhibit 48, and especially Exhibit 48's statement that "In essence, the Novavax vaccine has no linkage to cell lines from aborted fetuses." Inova has presented no admissible evidence of that fact. Exhibit 48 is Inova's own out-of-court statement on this topic and is inadmissible hearsay or double hearsay if offered for the truth of the matter asserted. Inova has presented no other admissible evidence on this point. Plaintiffs have submitted statements from trustworthy organizations describing legitimate concerns that the Novavax vaccine was indeed tested using fetal cell lines. *See* Dkt. 121-14, 121-15, 121-16, 121-17.

80. To any extent that Inova is seeking to establish the truth of the statements contained in its Exhibit 50, Plaintiffs dispute those statements, and especially Exhibit 50's statements regarding the Novavax vaccine's alleged lack of association with abortion. Inova has presented no admissible evidence of that fact. Exhibit 50 is Inova's own out-of-court statement on this topic and is inadmissible double hearsay if offered for the truth of the matter asserted. Inova has presented no other admissible evidence on this point. Plaintiffs have submitted statements from trustworthy organizations describing legitimate concerns that the Novavax vaccine was indeed tested using fetal cell lines. *See* Dkt. 121-14, 121-15, 121-16, 121-17.

82.  Plaintiffs dispute Inova's assertion that Dr. Chand "informed Mr. Ellison that the Novavax vaccine" would be "an option for satisfying Inova's COVID-19 vaccination requirement." Inova cites no admissible evidence in support of this contention. Inova's Exhibit 51 contains emails from Dr. Chand to Mr. Ellison that do not mention Inova's COVID-19 vaccination requirement.[2] And Mr. Ellison testified that Dr. Chand mentioned to him the Novavax vaccines availability only "[i]n the general retail environment," and that "[i]t was *not* conveyed to me," in his understanding,

---

[2] Inova may contend that an attachment to those emails mentioned the requirement, but no such attachment is in the record. In any event, the text of Dr. Chand's emails does not mention the vaccination requirement, and Inova has offered no evidence that Mr. Ellison read or understood any attachment.

that Novavax was an option for him to comply with Inova's vaccine policy. Ex. 2 to Defendants' Motion ("Ellison Tr."). at 148:2-10 (emphasis added).

83. Plaintiffs dispute Inova's assertion that Mr. Ellison stated it was "too late" for him to receive the Novavax vaccine "because he had accepted another job." As Inova's Exhibit 51 reflects, Mr. Ellison's emails to Dr. Chand never referred to the Novavax vaccine. Dr. Chand's email expressed respect for Mr. Ellison's "sincerely held religious beliefs on vaccination." Dkt. 118-51 at 2. In response, Mr. Ellison stated his wish that Inova's approach to religious exemptions would change, but said "it is too late" for such a change to benefit him:

> The vast majority of religious exemption requests have been denied by the committee. [Inova] is losing excellent team members over this and will lose more. Perhaps there is more you can do to demonstrate the respect you have for their religious beliefs. The law is also behind you.
>
> As for me, it is too late. The committee has denied me twice. I have no choice but to find other employment, for the sake of supporting my family.

*Id*. Dr. Chand never responded to this message. Feb. 23, Declaration of Michael Ellison (Ex. 22). ¶9.

Plaintiffs also dispute that Mr. Ellison "did not communicate to Inova any concern with the Novavax vaccine." As Inova concedes, Mr. Ellison expressly applied for an accommodation from the requirement that he receive ***any*** COVID-19 vaccine. (Inova SUMF 59, 65.) Moreover, as Inova concedes, the Novavax vaccine was not approved by either the FDA or Inova until after Mr. Ellison had completed all of his religious accommodation applications. *Compare id.* (final submissions in March and June 2022) *with id.* 76 (FDA approval for Novavax vaccine on July 13, 2022) and *id.* 78-79 (Inova approval for Novavax vaccine no earlier than August 16, 2022).

## ADDITIONAL FACTS

In addition to the above disputes of fact, the record discloses the additional facts that preclude Inova's request for summary judgment:

1.     Plaintiff Andrea Graham's EEOC charge expressly stated that Inova "has told me that if I do not get the vaccine, I will not be able to return to [work] after my [maternity] leave expires." Dkt. 118-54 at 2.

2.     Ms. Graham was raised Catholic and has believed from an early age that abortion is wrong and a sin. Ex. 21, Feb. 23, 2024, Graham Decl. ("Ex. 21".) ¶3.

3.     Since at least her 20s, Ms. Graham has tried hard to follow God's commands and path for her life, and she still attends at Christian church today. *Id.* ¶4.

4.     As a matter of religious faith, Ms. Graham seeks to avoid supporting abortion even indirectly—for instance, by avoiding purchases from retailers who she has identified support abortion, including Amazon.com. *Id.* ¶¶5.

5.     Ms. Graham remembers that when she started work as an emergency-room nurse at Inova, she was given a form asking whether she had religious objections to providing care to (among other people) patients who had or were having an abortion.  She knew that abortions are not performed in the emergency room, where she would be working, and that the only relevant care in the emergency room would be treating a woman who had serious complications after an abortion that had already happened. Ms. Graham has religious objections to assisting in abortion, but not to that kind of care—so she decided not to opt out of abortion-related care on that form. *Id.* ¶6.

6.     Until the middle of 2022, Ms. Graham did not know that cells and tissue from abortions have been used in researching and developing various pharmaceutical products. *Id.* ¶7.

7.     Until that time, she had views about medicines and medical products that are fairly commonplace in America, if on the conservative side. She believed (and still believes) that it is best to rely on the healing mechanism that God has built into our bodies, so she preferred to avoid pharmaceutical medicines—but she still would take Tylenol for bad headaches, for example, and willingly vaccinated her children. In other instances, by contrast, she felt that God was calling her to rely on natural, non-pharmaceutical treatments. *Id.* ¶8.

8.      In April or May of 2022, however, someone told Ms. Graham in a face-to-face conversation that COVID-19 vaccines had been developed or tested using cells that originated for aborted fetuses. Ms. Graham did not believe this claim and thought it was misinformation. *Id.* ¶10.

9.      Shortly thereafter, Ms. Graham decided to debunk the abortion-vaccine claim by reviewing relevant articles from medical journals at her home. She was surprised and dismayed to find that the claim was correct: not only did the medical literature show that all the available COVID-19 vaccines had been tested or even manufactured using cells that originated from aborted fetal tissue, it also showed that the same or similar cell lines (originating from abortions) had been used to test or develop a wide array of other pharmaceutical products. *Id.* ¶11.

10.      After processing this new information, Ms. Graham recognized that her Christian faith and beliefs regarding abortion required her to change the way she used medicines. *Id.* ¶12.

11.      One day in May 2022, Ms. Graham went through the medicine cabinet in her family home, looked at each of the medicines in it, and realized that her religious principles required her to stop using most of those medicines—either because she knew from her recent reading that the product had been developed or tested using cells that originated with abortions, or because such development and testing is so widespread in the pharmaceutical industry that she could not be confident whether the product had an association with abortion or not. *Id.* ¶13.

12.      For this reason, also in May 2022, Ms. Graham set about identifying alternative natural remedies, developed outside the standard pharmaceutical-industry processes, for each of the medicines in her cabinet. *Id.* ¶14.

13.      Also in May 2022, Ms. Graham called her family doctor to make a routine well-child checkup appointment for her son and was told that the checkup would include a vaccine. Although Ms. Graham does not recall for certain which vaccine it was, she thought right away that this was another pharmaceutical product that her religious beliefs no longer allowed her to accept. *Id.* ¶15.

14.      Around the same time (May or June 2022), Ms. Graham was herself offered a routine TDAP vaccine. Just months before, she probably would have received this vaccine. But after

learning what she had about pharmaceutical development processes associated with abortion, she could not receive the TDAP vaccine consistent with her religious beliefs. *Id.* ¶16.

15.     Ms. Graham knew that she had to talk about these convictions of hers with her husband, who had always been less conservative about medicines. After a heated discussion, she agreed not to interfere in his choices of medicines or medical treatment for himself and their children. Ms. Graham and her husband also agreed to maintain two medicine boxes side by side in their home—one containing standard over-the-counter medicines for her husband's use and one for Ms. Graham's use containing the substitutes that she had identified hat comport with her abortion-related religious objections. *Id.* ¶17.

16.     Ms. Graham does not have religious objections to providing any medication to other people in her work as a nurse—she holds herself responsible only for the medication choices she makes for herself. *Id.* ¶18.

17.     When Inova had originally required COVID vaccination for employees in late 2021, Ms. Graham was planning on immediately becoming pregnant and had believed, correctly, that it would be straightforward at that time to receive a medical exemption from vaccination on that basis. *Id.* ¶20.

18.     Ms. Graham indeed became pregnant in late 2021. *Id.* ¶21.

19.     In November 2021, Inova revoked all medical accommodations from COVID vaccination. Ms. Graham re-applied, thinking that an exemption based on pregnancy would again be straightforward, but before long realized that this was not the case. *Id* ¶¶22-23; Dkt. 23, Amended Complaint ¶34; Dkt. 49 Answer ¶34.

20.     This forced Ms. Graham to reflect deeply on other concerns she had been having that the COVID vaccine was not right. Ms. Graham thought and prayed hard about this in March 2022, and discerned that God was prompting her not to receive the vaccine, so she asked Inova for a religious accommodation on this basis. When Inova denied that request, Ms. Graham appealed. Ex. 21 ¶¶24-25.

21.     That appeal was pending at the time when Ms. Graham first learned about the connection that many medications (including the COVID-19 vaccines) have with abortion, as described above. Not long after she learned that, Inova denied her appeal. *Id.* ¶26.

22.     Ms. Graham decided to make an additional submission to Inova seeking a religious accommodation, stating her religious objections as completely as she could, including her objections grounded in her beliefs related to abortion based on what she had recently learned. That submission is Dkt. 121-9 in this case. Graham Decl. ¶25.

23.     No one from Inova ever contacted Ms. Graham with any questions or follow-up requests about that submission. Instead, Inova told her it would not consider the submission. *Id.* ¶¶28-29.

24.     Shortly thereafter, Ms. Graham went on maternity leave, and Inova never allowed her to return because she was unvaccinated. *Id.* ¶29.

25.     Inova initially granted Plaintiff Michael Ellison an exemption from COVID vaccination in the summer of 2021, but revoked that exemption in February 2022. Mr. Ellison promptly re-applied. Ex. 22 ¶2.

26.     On June 17, 2022, Inova told Mr. Ellison that his re-application was denied, and that if he were not vaccinated in two weeks—by July 1—he would no longer be allowed to work for Inova, but would be placed on administrative leave for a week and then fired. Ellison Decl. ¶3.

27.     Mr. Ellison appealed that denial on June 30. Although that paused the firing process temporarily, he had only a faint hope that he could ultimately change Inova's mind about firing him, and he regarded the appeal as a "Hail Mary" pass. Ellison Decl. ¶4.

28.     After Mr. Ellison filed his appeal, days turned into weeks and he heard nothing back from Inova, and it seemed more and more clear to him that Inova was indeed going to fire him for being unvaccinated. Ellison Decl. ¶5.

29.     By August 1, Mr. Ellison still had heard nothing at all from Inova about his appeal, and I understood that the writing was on the wall and Inova was inevitably going to fire him. He gave Inova notice that he would be resigning effective August 20. Ellison Decl. ¶6.

30.     Mr. Ellison's understanding quickly proved correct. Four days later, on August 5, Inova told him that his appeal was denied and gave him a new deadline to be either vaccinated or else suspended for a week and then terminated—August 19, before his resignation would become effective. Ellison Decl. ¶7.

31.     This confirmed the understanding that Mr. Ellison already had based on Inova's previous actions: he had to leave Inova in order to avoid being fired. Ellison Decl. ¶8.


## ARGUMENT

### I.     Andrea Graham Expressly Told The EEOC Inova Was Firing Her Because Of Her Religious Beliefs.

Inova initially contends that "Ms. Graham never challenged Inova's decision to end her employment in December 2022 (as opposed to the earlier denial of her exemption requests) before any administrative agency." (Dkt. 118 at 21.) Pointing out that Title VII requires an administrative filing before a lawsuit, Inova contends that Ms. Graham filed an EEOC charge about "only [Inova's] decision to deny her religious exemption request," not her firing. (*Id.* at 22.) Therefore, says Inova, she cannot sue about her firing.

Inova is badly wrong, both on the facts and on the law. On the facts, Ms. Graham's EEOC charge included a single paragraph of narrative text, and that text expressly complained that Inova "has told me that if I do not get the vaccine, I will not be able to return to [Inova] after my [maternity] leave expires." (*Supra*, Additional Facts ¶1.) And that is exactly what happened. Ms. Graham never returned to Inova from maternity leave; while the EEOC was still investigating her charge of discrimination, Inova fired her. *See* Inova SUMF ¶¶58 (Inova fired Ms. Graham on December 7, 2022), 87 (her EEOC charge remained under investigation until it ended at her request on December 20, 2022)

This is the fourth time in this case that the parties have briefed Inova's administrative-exhaustion argument. (*See* Dkt. 38 at 9-10 (Inova's motion to dismiss); Dkt. 62 at 12-13 (Inova's opposition to motion for leave to amend); Dkt. 79 at 17-18 (Inova's second motion to dismiss or

in the alternative for summary judgment).) Every single time, Ms. Graham has pointed out in detail that she did indeed tell the EEOC that Inova was going to fire her. (*See* Dkt. 40 at 14 (Plaintiffs' opposition to motion to dismiss); Dkt. 69 at 2 (Plaintiffs' reply in support of leave to amend); Dkt. 81 at 9 (Plaintiffs' opposition to second motion to dismiss or in the alternative for summary judgment).) Inova has never made any coherent response.

Legally, the caselaw could not be clearer that Inova's argument is wrong. The Fourth Circuit has held many times, over more than 40 years, that the standard for raising a claim in the EEOC is lenient. Specifically, it is a "generally accepted principle that the scope of a Title VII lawsuit may extend to any kind of discrimination like or related to allegations contained in the charge." *Stewart v. Iancu*, 912 F.3d 693, 705 (4th Cir. 2019) (cleaned up). "An administrative charge of discrimination does not strictly limit a Title VII suit which may follow; rather, the scope of the civil action is confined only by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination." *Chisholm v. U.S. Postal Serv.*, 665 F.2d 482, 491 (4th Cir. 1981). Thus, "[t]he touchstone for exhaustion is whether plaintiff's administrative and judicial claims are reasonably related, not precisely the same," and the question is simply whether "the [defendant] was afforded ample notice of the allegations against it." *Sydnor v. Fairfax Cnty., Va.*, 681 F.3d 591, 595 (4th Cir. 2012); *see also, e.g., Smith v. First Union Nat. Bank*, 202 F.3d 234, 247 (4th Cir. 2000) ("If a plaintiff's claims in her judicial complaint are reasonably related to her EEOC charge … the plaintiff may advance such claims in her subsequent civil suit."). This notice standard is consistent with broader principles underlying administrative exhaustion.

As this Court has repeatedly recognized, an employee's claim arises and limitations period begins to run "'from the time at which the employee is informed of the allegedly discriminatory employment decision, regardless of when the effects of that decision come to fruition.'" *Joyner–Pettway v. Cvent, Inc*, No. 1:16–cv–892 (LMB/TCB), 2017 WL 519860, at *5 (E.D.Va. Feb. 7, 2017) (Brinkema, J.) (quoting *Price v. Litton Bus. Sys., Inc*., 694 F.2d 963, 965 (4th Cir. 1982)).

> As the Fourth Circuit has explained … this rule has a strong rationale because it encourages "a potential charging party to raise a discrimination claim before it gets stale, for the sake of a reliable result and a speedy end to any illegal practice that proves out,' and it also serves to "protect employers from the burden of defending claims arising from employment decisions that are long past."

*Kulshrestha v. Shady Grove Reproductive Science Ctr, P.C.*, 668 F.Supp.3d 411, 417 (E.D.Va. 2023) (Ellis, J.) (quoting *E.E.O.C. v. Randstad*, 685 F.3d 433, 444–45 (4th Cir. 2012)).

Between these facts and this law, then, Inova's exhaustion argument is completely merit-less. Ms. Graham filed an EEOC charge while on maternity leave, stating that Inova had denied her a religious accommodation from its vaccination requirement and was threatening to fire her for her religious practice of refusing vaccination. (Dkt. 118-54 at 2.) This lawsuit alleges that Inova did indeed fire her for that very reason shortly thereafter, while the EEOC investigation of her charge was still underway. There is no conceivable version of the "reasonably related" standard that Ms. Graham has failed to satisfy. In particular, it is obvious that an administrative investigation of Ms. Graham's charge would have been likely to reveal that Inova was following through, and did follow through, on its threat to fire her that she expressly reported to the EEOC.

Inova insists that denying an employee an accommodation and firing an employee are sep-arate adverse actions, and the EEOC must be notified of both of them. (Dkt. 118 at 22-23.) But of course, Ms. Graham **did** notify the EEOC both that Inova had denied her an accommodation and that Inova had informed her of its decision to discharge her. Inova cites no decision, and we are aware of none, imposing a formalistic requirement that an employee use two separate charging documents to make these two allegations. All of the decisions that Inova cites (*see id.*) involve plaintiffs who tried to sue their employer about a separate adverse action that they had told the EEOC *nothing* about at all. Those decisions are obviously inapposite here, where Ms. Graham did specifically tell the EEOC that Inova had said it would fire her.

In sum, Ms. Graham amply complied with the requirement of filings an EEOC charge.

13

## II.   Ms. Graham's Sincerity And Credibility Are Obvious Jury Questions.

Inova next argues that Ms. Graham does not, or did not, have any sincere religious beliefs that conflict with COVID-19 vaccination. This Court previously ruled that only Ms. Graham's abortion-related objections qualify as religious in nature. Dkt. 76 at 10, Dkt. 75 at 6. While Ms. Graham respectfully disagrees with that ruling and reserves her right to appeal from it, that ruling means that the focus here is on Ms. Graham's abortion-related religious objections to vaccination.

Inova does not dispute that Ms. Graham informed Inova that she had abortion-related religious objections to COVID vaccination. Paragraph 52 of Inova's Statement of Undisputed Material Facts admits that Ms. Graham **did** tell Inova exactly that. Inova just maintains that, when Ms. Graham told Inova she had such objections, she was lying.

The evidence does not remotely warrant summary judgment for Inova on that score. The statement of additional facts above explains what Ms. Graham will tell the jury. In short, Ms. Graham has had religious objections to abortion for almost her entire life, and has taken great trouble to avoid supporting abortion. However, until May 2022, she had not known that a wide array of pharmaceutical products are tested or developed using cells that originated with aborted fetal tissue. When she first heard this, she did not believe it and set out to debunk it—but her discovery that it was true forced her to develop an alternative medicine box, start declining vaccinations of various kinds (not just COVID), and have a difficult conversation with her husband about how her convictions would affect their family life. *See supra* p. 9 (¶15). Although she previously had taken a generally conservative approach to medicine and occasionally opted out of treatments based on her belief that she should favor God-given natural methods of healing, starting in May 2022 Ms. Graham's abortion related beliefs required her to take a considerably broader approach to her objections to medications. *See supra* pp. 7-8 (¶¶7-14).

Ms. Graham had previously sought a pregnancy-related medical accommodation from Inova's COVID vaccine requirement based on her (initially correct) belief that qualifying on that basis would be straightforward. When that changed, Ms. Graham had initially decided to request a religious exemption based on her convictions about natural healing methods. *See supra* pp. 9-10

(¶17-20). Inova denied this request shortly after Ms. Graham's religious awakening regarding aborted fetal cells began. *See supra* pp. 8, 10 (¶¶8-12, 21-23). Ms. Graham then decided to submit an additional letter to Inova describing all of her beliefs, including the abortion-related religious objections that she had recently learned about. She did so on July 11, 2022. No one from Inova followed up to ask Ms. Graham anything about her religious beliefs. Nor did Inova ever tell Ms. Graham that it did not believe her statements about her abortion-related objections. In fact, Inova just told her that it would not consider her statements at all. *See supra* p. 10 (¶¶22-23).

Inova's "insincerity" contention cannot succeed unless most of this testimony by Ms. Graham is lies. According to Inova, Ms. Graham has medical and perhaps philosophical objections to COVID vaccination. Ms. Graham's statements about her beliefs on abortion, says Inova, were concocted for purposes of getting an exemption on those other grounds, or for purposes of winning this case, and are not credible.

The most basic principles of summary-judgment law make crystal clear that this is an argument for the jury, not for summary judgment. "Credibility determinations … are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *accord, e.g., Martin v. Duffy*, 977 F.3d 294, 304 (4th Cir. 2020). With respect to religious-freedom claims in particular, an avalanche of court decisions recognize that attacks on the sincerity of a plaintiff's professed religious beliefs are fact questions for the jury, not for summary judgment. *Sharp v. Liebel*, No. 3:20-CV-327-JD-MGG, 2021 WL 4147036, at *7 (N.D. Ind. Sept. 13, 2021); *Zapata v. Ducart*, No. 17-CV-02557-EMC, 2019 WL 2476685, at *11 (N.D. Cal. June 13, 2019) (collecting cases); *Williams v. Miller*, No. 04-CV-0342-MJR, 2007 WL 2893641, at *4 (S.D. Ill. Sept. 28, 2007); *Williams v. Moffett*, No. 18 C 5563, 2021 WL 825670, at *15 (N.D. Ill. Mar. 3, 2021) (collecting cases). Although this issue arises most often in prison litigation, courts apply the same principle in Title VII cases as well. *E.g.*, *Muhammad v. New York City Transit Auth.*, 52 F. Supp. 3d 468, 481–82 (E.D.N.Y. 2014).

Conversely, summary judgment as to a religious adherent's insincerity is appropriate only when the adherent's testimony about her faith is completely conclusory. As far as we can tell, Inova cites only two cases granting summary judgment on this ground. One of them is *Gardner-Alfred v. Federal Reserve Bank*, where the plaintiff claimed to object to "invasive Western medical procedures," but there was no evidence that she had ever declined any other medical procedure on that basis. No. 22-CV-1585 (LJL), 2023 WL 6214863, at *15–16 (S.D.N.Y. Sept. 25, 2023) (cleaned up). Similarly, Inova's other case is *Aukamp-Corcoran v. Lancaster General Hospital*, where the plaintiff alleged a religious belief that "compelled her to keep her blood pure … and free from contaminates," but apparently had never refused any other medical treatment (or tattoo, or body piercing) on that ground, and apparently had gotten the idea from "a secular, antivaccination Facebook group" a few days before submitting her request for a religious accommodation. No. CV 19-5734, 2022 WL 507479, at *5 (E.D. Pa. Feb. 18, 2022).

This case is far different. As just described, Ms. Graham will testify that her abortion-related vaccine objections are grounded in her lifelong beliefs. She will explain in detail when and how she developed these sincere objections, and she will explain that she takes numerous other measures to honor those beliefs even when it is quite inconvenient for her. Inova may argue to the jury, if it wishes, that none of this is true, or that Ms. Graham is really doing all of these things for non-religious reasons despite her own statements to the contrary. But that *is* an argument for the jury, not for summary judgment.

Perhaps Inova will object that Ms. Graham did not tell ***Inova*** all the details about how her abortion-related objections to medical treatments developed, or about the other ways that she observes those beliefs. But that does not matter. As Plaintiffs have explained in their separate brief seeking partial summary judgment, the law requires, at most, only that a religious employee "informed the employer" of his or her religious practice—and the Supreme Court has clarified that even that is not strictly necessary, as long as the employer even ***suspected*** that the employee ***might*** need a religious accommodation. *See* Dkt. 121 at 12-14. Inova cites nothing (and Plaintiffs are aware of nothing) to suggest that, once the employee has given notice of her belief, she bears some

additional burden of *persuading* the employer that his or her belief is sincere. A Title VII failure-to-accommodate lawsuit is not a request for appellate review of an employer's decision to fire the plaintiff. The question is not whether the employer's decision was supported by the evidence presented to it. Thus, if an employee actually lies to his employer and asserts a religious belief that he does not really hold, of course the employer has no legal obligation to accommodate it—but if the employer ***wrongly*** dismisses an employee's sincere assertion as a lie, it cannot escape Title VII liability by arguing that the employee was not convincing enough.

Inova's references to the EEOC's *Compliance Manual* only confirm that its challenge to Ms. Graham's credibility is badly out of place at summary judgment. As the EEOC notes, an employer "should ordinarily assume that an employee's request for religious accommodation is based on a sincerely held religious belief." *EEOC Compliance Manual* 12-I.A.3, *available at* https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination#h_9546543277761610 748655186/. Although the EEOC identifies "[f]actors that … might undermine an employee's credibility" and includes "whether the timing of the request renders it suspect (e.g., it follows an earlier request by the employee for the same benefit for secular reasons)," the EEOC also expressly recognizes that "***none of these factors is dispositive***" and that "an individual's beliefs—or degree of adherence—may change over time, and therefore an employee's newly adopted or inconsistently observed religious practice may nevertheless be sincerely here." *Id.* at 12-I.A.2;. Thus, the EEOC recognizes that, "[i]f .. an employer has an objective basis for questioning … the sincerity of a particular belief, observance , or practice," the proper remedy is for the employer to "***seek[] additional supporting information***" from the employee. *Id.* at 12-I.A.3. Only then must the employee "provide information that addresses the employer's reasonable doubts." *Id.* at 12-IV.A.2.

Inova, of course, followed none of these legal requirements. Although Inova now argues that Ms. Graham must be lying about her abortion-related religious objections to vaccination, Inova made no finding to that effect previously. It never asked Ms. Graham for additional information substantiating her beliefs. Inova does not even present any evidence that it even ***considered***

Ms. Graham's notice of these objections. Inova may try to persuade a jury not to believe Ms. Graham's testimony. But Inova cannot possibly win summary judgment that her statements of abortion-related religious objections—either to Inova or in this Court—are not believable to any reasonable person. *See, e.g.*, *EEOC v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1575 (7th Cir. 1997) (en banc) (finding religious sincerity "generally will depend on its assessment of the employee's credibility" and could not be determined as a matter of law even when a plaintiff—who sought time off for Yom Kippur—"readily conceded that she is not a particularly religious person and that she does not observe every Jewish holiday" and had not requested time off for any Jewish holiday during her eight years of employment); *Equal Employment Opportunity Commission v. Triangle Catering*, LLC, No. 5:15-CV-00016-FL, 2017 WL 818261, at *9 (E.D.N.C. March 1, 2017) (finding that even when "the sincerity of [the plaintiff's] religious beliefs exist …. [a] judge generally cannot disregard personal testimony on credibility grounds" and grant summary judgment) (citing *Gray v. Spillman*, 925 F.2d 90, 95 (4th Cir. 1991)); *E.E.O.C. v. Union Independiente de la Autoridad de Acueductos y Alcantarillados de Puerto Rico*, 279 F.3d 49, 56 (1st 2002) (finding "the sincerity of an employee's religious belief are quintessential fact questions. As such, they ordinarily should be reserved for the factfinder at trial, not for the court at summary judgment.") (quotation omitted).

### III.   Plaintiffs Indisputably Object To All COVID-19 Vaccines, Including The Novavax Vaccine.

Inova next argues that Plaintiffs did not *really* have religious objections to Inova's vaccine mandate, because—contrary to Plaintiffs' own assertions—they do not really object to the Novavax vaccine. Plaintiffs themselves have separately moved for summary judgment on this issue of conflict. (Dkt 121.) For the same reasons that Plaintiffs' motion for summary judgment should be granted on this issue, Inova's should be denied.

We will not repeat those reasons in full here, but to summarize: Plaintiffs expressly told Inova that they objected to *all* COVID vaccines. (*Id.* at 17.) Although the Novavax vaccine was

not available at the time Plaintiffs applied, now that it *is* available, Mr. Ellison and Ms. Graham have both determined that they object to it as well, on the same abortion-related grounds as the other vaccines. (*Id.* at 17-18.) Mr. Ellison and Ms. Graham have investigated the Novavax vaccine and determined that it was, or is unacceptably likely to have been, developed using testing on abortion-derived cell lines. (*Id.* at 17-16, *id.* Listing of Undisputed Facts ¶¶22, 25, 36, 39.) That determination is consistent with public statements by prominent religious and scientific organizations that are opposed to abortion, which assert that the Novavax vaccine was tested using cells derived from abortions. (*Id.* at 18.) And that belief was shared by many other people (including many Inova employees) with abortion-related religious objections to COVID vaccination. Moreover, Inova ***knew*** about these likely religious objections to the Novavax vaccine before it even became available. (*Id.*)

At least in these circumstances, it is for Plaintiffs—not Inova—to determine how sure they need to be that there is no link between the Novavax vaccine and abortion before they can receive it consistent with their own religious beliefs. (*Id.* at 16-19.) Thus, Plaintiffs' assertion that they object on religious grounds to all COVID-19 vaccines, including Novavax, is conclusive here.

That argument, set forth fully in Plaintiffs' separate motion briefing, also requires denying Inova's request for summary judgment on the issue of conflict. Here, we will add only two additional points.

First, it is worth noting that Inova's "Novavax" argument indisputably is an after-the-fact justification that Inova did not formulate until after this litigation arose. Inova could not possibly have actually been thinking of the Novavax vaccine when it told Plaintiffs (and many other employees) that it would not accommodate their religious beliefs, and would fire them if they did not get vaccinated. That is because Inova denied Plaintiffs' accommodation requests ***well before*** Inova ever approved the Novavax vaccine as a way to comply with its vaccine mandate for employees. Inova's own Statement of Undisputed Material Facts admits that Inova did not allow the Novavax vaccine until August 16, 2022. (Dkt 118, SUMF ¶¶78-79.) By contrast, Inova admits that it rejected Ms. Graham's abortion-related accommodation request long before then—on July 13, 2022. (*Id.*

¶53.) Similarly, Inova admits that it rejected Mr. Ellison's (second) abortion-related accommoda-
tion request—and informed him of his upcoming termination date if he remained unvaccinated—
on August 5, 2022. (*Id.* 81.) Nor did Inova ever tell either Plaintiff that it did not think they needed
religious accommodations because they could just receive the Novavax vaccine. Instead, Inova
obviously developed this argument after Plaintiffs filed this lawsuit—just in time for Inova's coun-
sel to raise it at oral argument on Inova's second motion to dismiss, even though it had never been
mentioned in the briefing.

To be sure, that does not excuse Plaintiffs from showing that their religious beliefs really
do conflict with Inova's vaccine mandate. Plaintiffs have amply and indisputably shown that, as
detailed in their separate brief in support of partial summary judgment. (Dkt. 121, Pt. II.) But in a
case where Inova is attacking Plaintiffs' sincerity and accusing Plaintiffs of making things up to
support their claims, it is more than a little suspect that Inova has placed such heavy emphasis on
a made-for-litigation argument that Inova obviously did not think about in deciding to fire Plain-
tiffs.

Second, and more importantly, Inova is wholly wrong to suggest (Dkt. 118 at 27) that "[t]he
Court has taken judicial notice" that the Novavax vaccine has no association with abortion. The
Court has done nothing of the sort, and could not do so. The Court's sole mention of the Novavax
vaccine came in a footnote in the course of denying part of Inova's motion to dismiss. Dkt. 76 at
12 n.12. The Court did not mention judicial notice, and did not discuss any legal factors, tests, or
precedents related to judicial notice. Nor did the Court have any need to do so—it was Inova that
had advanced arguments relying on Novavax, and the Court was rejecting those arguments as a
basis for dismissal, so making a formal decision about judicial notice would have been superfluous.
*See id.*

In any event, if the Court ***had*** purported to take judicial notice of Novavax's supposed lack
of association with abortion, that would have been plain error that should be corrected now. Inova
presented the Court with no legal or factual grounds for taking judicial notice of this supposed
fact—indeed, Inova did not mention Novavax in its briefing on the motion to dismiss at all. And

the Court itself did not identify any such grounds. Nor are there any. As a matter of law, judicial notice is permitted only of facts that are "generally known within the trial court's territorial jurisdiction" or that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(a). Neither of those criteria are remotely met here. There is no plausible argument that the details of the development history of an obscure vaccine are common knowledge within the Eastern District of Virginia. Nor has Inova (or anyone else) ever identified any "source[] whose accuracy cannot reasonably be questioned" on that point. At the time the Court issued the relevant opinion, Inova had not cited any source on this point at all—it had raised the issue only at oral argument.[3] In its current brief and its previous briefing, Inova has repeatedly cited a broken Internet link to the FDA's announcement that it was approving the Novavax vaccine for use. (*See* Dkt. 118 at SUMF 76). But that announcement said nothing about the development history of the Novavax vaccine, and does not purport to address whether it has any link with abortion.[4]

And the sources that Inova **has** cited on that point do not remotely meet Rule 201's requirement of unquestionable accuracy. On this motion, Inova submits an unsigned letter from Novavax's "Global Medical Information" department stating that its COVID vaccine's "development, manufacture or release testing" did not use "human fetal-derived cell lines." (Dkt. 118 SUMF ¶76, citing Dkt. 118-47 (emphasis added).) Inova then cites to Inova's own repetitions of that statement, which give no indication of having any independent basis. (*Id.* SUMF ¶¶77, 80, citing Dkt. 118-48, 118-50.) And that is all: those are Inova's only sources to ground "judicial notice" on this point.

---

[3] When Inova did raise the Novavax factual issue at oral argument, despite the absence of any advance notice, Plaintiffs' counsel immediately advised the Court that "from research we've done for other cases … there is a factual controversy about whether that [Novavax] vaccine has any connection to abortion," and "I would caution that there's more to the story than you've heard today and, probably, than we can realistically get into at oral argument." Dkt. 4 at 60:12-22.

[4] *See supra* ¶76 (providing link to cached version of historic web site). The FDA's announcement noted that "[t]he spike protein in this vaccine is produced in insect cells" and the vaccine "contains saponin extracts from the bark of the Soapbark tree." *Id.* But it did not purport to discuss the vaccine's development history.

Judicial notice is manifestly inappropriate on this basis, both as a matter of law and as a matter of common sense. Courts regularly recognize that a commercial company's statements about its own products and operations cannot remotely be judicially noticed as true. *E.g., Victaulic Co. v. Tieman*, 499 F.3d 227, 236 (3d Cir. 2007), *as amended* (Nov. 20, 2007); *Whitaker v. Pharmavite LLC*, No. CV2204732DMGMARX, 2023 WL 3370729, at *1 n.2 (C.D. Cal. May 9, 2023); *Genasys Inc. v. Vector Acoustics, LLC*, 638 F. Supp. 3d 1135, 1146 (S.D. Cal. 2022); *Amazon.com Servs. LLC v. Paradigm Clinical Rsch. Inst., Inc.*, 631 F. Supp. 3d 950, 962 (W.D. Wash. 2022). And of course that makes perfect sense. Companies describing their own products have powerful incentives to make aggressive statements about the products' characteristics that a reasonable person might question. If such statements could be judicially noticed as "unquestionable," that would be likely to shut down many whole fields of litigation, such as consumer fraud. That obviously would not be appropriate. In order for such statements to potentially be accepted by a trier of fact as true, they must be presented under oath and subjected to vigorous cross-examination.

Indeed, Inova's own cited materials in this case make clear that Novavax had incentives of precisely that kind. Novavax's COVID vaccine reached the U.S. market more than a year after those of its competitors, at a time when Americans who wanted to be vaccinated had already had ample opportunity to do so. It was likely, then, that a significant part of Novavax's potential profits from this vaccine would come from people who had been reluctant to receive its competitors' vaccines. And Novavax obviously knew that and messaged accordingly. In this very case, Inova's own brief on its earlier-filed, still-pending summary judgment motion cites an article (*see* Dkt. 83 at 6) noting that Novavax's "unusual selling point" was "the potential to woo vaccine skeptics who reject other widely available vaccines because of distant links to abortion," and quoting Novavax's CEO as stating that "[i]n the U.S., **the primary market** I think in 2022 is going to be to supply a vaccine, our normal two-dose regimen, to a lot of people who have been hesitant to get other vaccines."[5] (Even that article acknowledged that people with religious objections to abortion

---

[5] https://religionnews.com/2022/02/18/could-novavax-win-over-some-religious-vaccine-skeptics/ (emphasis added) (accessed Feb, 23, 2024).

disagreed about whether the Novavax vaccine was acceptable, and noted that "Novavax's distance from the [fetal] cell lines might not be enough for some" religious objectors. *Id.*) So Novavax had every reason to downplay any connection between its vaccine and abortion, and had strong incentives to talk about certain ways that its vaccine was *not* connected with abortion without mentioning ways that it was.

Indeed, Inova's own documents produced in this case show that when Inova itself pressed Novavax to respond to the specific concerns of abortion critics on this point, Novavax responded not with any specific explanation, but with conclusory denials and pseudoscientific bluster about "all life on Planet Earth emerg[ing] from the same source during the Big Bang." (*See* Dkt. 121-20.) In short, far from being unquestionably accurate, Novavax's statements promoting its own product are eminently questionable.

To sum up: Plaintiffs have reasonably assessed that the Novavax vaccine has too much of an association with abortion to be compatible with their religious beliefs. Far from disproving any such factual connection, Inova has offered no admissible evidence on the subject at all. Plaintiffs, not Inova, are entitled to summary judgment on the question of whether their asserted beliefs conflict with Inova's COVID vaccine mandate.

## IV.    Mr. Ellison Easily Meets The Legal Test For Constructive Discharge.

Finally, Inova argues that it did not inflict an adverse employment action on Mr. Ellison, as required for Title VII liability, because Mr. Ellison resigned on the day following the final deadline Inova had given him to be vaccinated. Inova acknowledges that Mr. Ellison is pursuing a claim of constructive discharge, but it argues that he cannot make the required showing for such a claim. Inova is wrong because it is arguing under the wrong legal standard.

Inova contends that Mr. Ellison cannot show that his "working conditions" became "intolerable," and so cannot show constructive discharge. (Dkt. 118 at 28.) But "intolerability" is only one of the varieties of constructive discharge—and it is not the one that Mr. Ellison is arguing here. Rather,

23

> [c]ourts have recognized that plaintiffs can also establish a constructive discharge claim by showing that, without regard to the hostility of the work environment, the "employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated, and the plaintiff employee resigns." *EEOC v. Univ. of Chi. Hosps.*, 276 F.3d 326, 332 (7th Cir. 2002); *see also Burks v. Okla. Pub. Co.*, 81 F.3d 975, 978 (10th Cir. 1996) ("This court has recognized that an employee can prove a constructive discharge by showing that she was faced with a choice between resigning or being fired.")

*Decoster v. Becerra*, No. CV TDC-21-2195, 2022 WL 3083343, at *4 (D. Md. Aug. 3, 2022); *accord e.g., Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184, 1188 (2d Cir. 1987). Thus, a plaintiff who "resigns in lieu of termination" can bring a constructive-discharge claim. *Allen v. Baltimore Cnty. Bd. of Educ.*, No. CV ELH-21-1006, 2023 WL 5352416, at *21 (D. Md. Aug. 21, 2023).

That is exactly Mr. Ellison's situation here. As Inova concedes, it told Mr. Ellison that if he were not vaccinated by August 19, 2022, he would no longer be allowed to work for Inova, but would be placed on leave for a week and then fired. (Dkt. 118 SUMF ¶81.) As Inova also concedes, Mr. Ellison remained at Inova until *after* that August 19 deadline, leaving Inova on August 20 and starting other employment on August 22. (*Id.* ¶¶84-85.) So this is not remotely a case where an employee left "with a substantial amount of time remaining on his grace period" or "before the conclusion of an extended discharge process." (*See id.* at p.30 (cleaned up).) Mr. Ellison stayed at Inova until ***after*** his grace period was over, after Inova had said he could no longer perform work for it, and mere days before Inova had said it would officially fire him. Nor did Mr. Ellison leave Inova when faced with the mere "prospect of being fired at the conclusion of an extended process." (*Id.* at 29-30 (citation omitted).) Mr. Ellison stayed until long after Inova's process was over and his firing was imminent and certain.

It does not help Inova to argue that Mr. Ellison gave Inova *notice* of his impending resignation a few weeks earlier, before Inova made its final decision on his religious exemption appeal. (*Id.* at 30.) Mr. Ellison gave notice of his resignation because he thought Inova was going to fire him, and he was right—just a few days later, Inova announced that it was indeed going to fire him, and in fact that it would cut off his ability to perform work for Inova *before* his announced

24

resignation took effect. Of course, even after Mr. Ellison gave notice of his resignation, he was free to change his mind and stay at Inova until he actually quit. In fact, even in the process of resigning, Mr. Ellison repeatedly made very clear to Inova that he had a "vested interest" in Inova and wished he could stay. Dkt. 118-44, 118-51.

If Inova had responded to these actions of Mr. Ellison by granting his religious accommodation—or even by tabling its consideration of his accommodation request in light of his potential departure—that might have made it difficult for Mr. Ellison to corroborate his suspicion that he was about to be fired. But Inova did neither of those things. Instead, Inova announced that if Mr. Ellison *did* stay, it would fire him—and indeed that it would cut off his ability to perform work at Inova even before his announced departure date. It was in that context that Mr. Ellison made his final choice to actually leave Inova and start work elsewhere.

In other words, Mr. Ellison announced his resignation in anticipation of Inova firing him, Inova quickly confirmed that his anticipation was completely correct and that he could not stay even if he wanted to, and Mr. Ellison responded by following through with his announced plan to quit. These facts come well within the legal requirements for constructive discharge. At the very least, there remains a question of fact for the jury whether Mr. Ellison's decision first to announce his resignation and then to follow through with it, taken together, were his efforts to avoid an inevitable discriminatory discharge.

A final note here is Inova's remarkable willingness to criticize Plaintiffs on blatantly contradictory grounds. Inova's summary judgment brief first suggests that Ms. Graham did something nefarious because, after Inova told her she could not return to work, Ms. Graham "started employment with a new employer" without officially resigning from Inova, "while continuing to receive Inova benefits" until Inova formally terminated her. (Dkt. 118 at 2.) One would think, then, that Inova would approve of Mr. Ellison's official departure from Inova on the first day that Inova told him he was no longer eligible to perform work for it. But no—Inova opportunistically applies the opposite standard to Mr. Ellison, apparently contending that he *should have* remained an official Inova employee until the bitter end, even after he had started working elsewhere.

Avoiding unproductive and artificial disputes like these is the very point of the in-lieu-of-termination branch of the constructive discharge doctrine. The doctrine holds that an employee who quits in order to avoid an inevitable discriminatory discharge has suffered an adverse employment action. That is exactly what Mr. Ellison did here. He has amply shown an adverse employment action, or at minimum created a question of fact on that score.

## CONCLUSION

The Court should grant Plaintiffs' motion for partial summary judgment, deny Inova's motion, and set the remaining issues for trial.


Dated:  February 23, 2024                    Respectfully submitted,

                                             **MICHAEL ELLISON, ANDREA GRAHAM,
                                             AND ARIN JENKINS**

                                             By their Counsel:

                                               s/Michael B. Sylvester
                                             Joshua A. Hetzler (VSB No. 89247)
                                             Michael B. Sylvester (VSB No. 95023)
                                             FOUNDING FREEDOMS LAW CENTER
                                             708 E. Franklin Street
                                             Richmond, VA 23219
                                             Tel: 804-971-5509
                                             Email: josh@foundingfreedomslaw.org
                                                        michael@foundingfreedomslaw.org

                                             Samuel W. Diehl (admitted *pro hac vice*)
                                             Nicholas J. Nelson (admitted *pro hac vice*)
                                             CROSSCASTLE PLLC
                                             333 Washington Avenue N., Ste 300-9078
                                             Minneapolis, MN 55401
                                             Tel: (612) 429-8100
                                             Fax: (612) 234-4766
                                             Email: sam.diehl@crosscastle.com
                                                        nicholas.nelson@crosscastle.com

4895-5795-5735, v. 1